**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

C.W.; D.S.; M.C.; A.H.; S.G.; E.L.; S.A.;   :
F.E.; and D.G., by his next friend THEO   :
LIEBMANN; and other similarly situated   :
youth,   :
                                     :      13 Civ. _____

                  Plaintiffs,   :
                                       :

     -against-                        :      **CLASS ACTION COMPLAINT**
                                       :

THE CITY OF NEW YORK,   :
                                       :

                Defendant.   :
                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## INTRODUCTION

Plaintiffs C.W., D.S., M.C., A.H., S.G., E.L., S.A., F.E., and D.G., by his next friend Theo Liebmann (collectively, "Named Plaintiffs"), by and through their attorneys, The Legal Aid Society and Patterson Belknap Webb & Tyler LLP, bring this class action complaint for declaratory and injunctive relief to challenge the acts and omissions of Defendant the City of New York (the "City").

This is a civil rights action. The Named Plaintiffs seek relief on behalf of themselves and similarly situated individuals (collectively, "Plaintiffs") to redress the City's violations of their rights, privileges, and immunities secured by: The Fourteenth Amendment to the United States Constitution; The Civil Rights Act of 1871, 42 U.S.C. § 1983; The New York State Runaway and Homeless Youth Act, N.Y. Exec. Law § 532, *et seq.*; The Americans with Disabilities Act, 42 U.S.C. §§ 12117, 12132, *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, 794a(a)(2); and New York City Administrative Code § 8-107(4)(a).

Plaintiffs hereby allege as follows based on information and belief:

## PRELIMINARY STATEMENT

1.      Every night, roughly 3,800 youth in New York City are homeless.[1]  Some

have been rejected by their families because of their sexual orientation or gender identity.

Others have been abandoned or have left home after habitual abuse or neglect.  Many suffer

from mental illness.

2.      Federal and state laws require New York City to provide shelter —

without qualification — to *any* homeless youth ages 16 to 20 who seeks it.  It has failed to do

so.

3.      Instead of providing shelter to its homeless youth, the City denies them

shelter outright because it does not have enough beds.  The City provides 253 youth shelter beds

for the thousands of youth who need them.[2]

4.      Homeless youth shut out of the City's youth shelters are placed on waiting

lists that number into the hundreds.  Sometimes the waiting lists grow so long that homeless

youth must wait days just to add their names.

5.      In December 2013, City Council member Lewis Fidler described the dire

state of affairs for homeless youth in New York City:

> You all know the data – 3,800 kids sleeping on the streets.
> Hundreds of shelter beds means that there are waiting lists.  I got

---

[1] Lance Freeman and Darrick Hamilton, *Empire State Coalition of Youth and Family Services: A Count of Homeless Youth in New York City* (March 26, 2008) ("ESC 2008 Report"), *available at* http://www.citylimits.org/images_pdfs/pdfs/HomelessYouth.pdf.

[2] Empire State Coalition of Youth and Family Services, *The New York City Association of Homeless and Street-Involved Youth Organizations' State of the City's Homeless Youth Report 2011* at 21 ("ESC 2011 Report"), *available at* http://www.empirestatecoalition.org/main/pdf/2011.nyc.homeless.youth.report.pdf.

a letter from a [shelter provider] . . . telling me that they have 170 kids on the waiting list right now.[3]

6.      Forced to the street, homeless youth sleep at Chelsea Piers or ride all night on the subway — many choose the A, C, E lines (nicknamed "Uncle Ace's House") because they have the City's longest routes.  Some "couch surf" with friends or strangers; others sleep in Central Park or St. Nicholas Park in Harlem, or in abandoned buildings around the City.

7.      Living on the street exposes homeless youth to grave and irreparable harm.  They are susceptible to extreme weather, suffer from malnutrition, and risk contracting illnesses like pneumonia and hypothermia that often require hospitalization.

8.      Worse, homeless youth are victims of violence, sexual assaults, and the sex trade.  Many are pressured to trade sex for a place to sleep or shower.  About one-third to half of homeless youth (both men and women) exchange sex for money, food, or a place to stay.[4]  Many are victims of sex trafficking.[5]  Each night, an estimated 150 homeless youth are forced to perform sex work.[6]  These dangers expose them to a significantly heightened risk of sexually transmitted diseases, including HIV.  One estimate indicates that between 10% and 30% of homeless youth in New York City are HIV-positive.[7]

---

[3] New York City Council Hearing: Oversight – How do the Human Trafficking Intervention Courts address the needs of New York City's Runaway and Homeless Youth Population (Dec. 12, 2013), *video available at* http://legistar.council.nyc.gov/MeetingDetail.aspx?ID=275418&GUID=FBA1DED3-00EA-4620-B113-8ED79EE705AA&Search= ("Dec. 12, 2013 City Council Hearing").

[4] Marya Viorst Gwadz et al., *The initiation of homeless youth into the street economy*, 32 Journal of Adolescence 357, 358 (2009).

[5] Ric Curtis et al., *The Commercial Sexual Exploitation of Children in New York City* (September 2008), *available at* http://www.courtinnovation.org/sites/default/files/CSEC_NYC_Executive_Summary.pdf.

[6] ESC 2008 Report.

[7] Empire State Coalition of Youth and Family Services, *The New York City Association of Homeless and Street-Involved Youth Organizations' State of the City's Homeless Youth Report*

3

9.     The longer that youth remain homeless, the more difficult it is for them to engage in structured, productive activity, such as enrolling in school or maintaining a job.[8]  For many, the lack of shelter causes them to turn to dangerous behavior: Suicide is the leading cause of death among homeless youth in New York City.  One estimate indicates that one of every four homeless youth will attempt suicide.[9]

10.     Even when homeless youth are lucky enough to secure a bed at a City youth crisis shelter, the City limits their stay to just 30 days (or up to 60 days if the City grants an extension).[10]  After that time, unless the homeless youth has found somewhere else to stay, the City discharges the youth from shelter back to the street.

11.     The revolving door between shelter and the street is common.  One City shelter reported that, in 2012, it did not know the future living situation for roughly 45% of homeless youth at the time of discharge.

12.     The City is aware of this problem.  Jeanne Mullgrav, Commissioner of the Department of Youth & Community Development ("DYCD"), the agency charged with protecting homeless youth, has testified to the City Council that hundreds of homeless youth are denied youth shelter by the City each night.[11]

---

*2009* at 37 ("ESC 2009 Report"), *available at* http://www.empirestatecoalition.org/main/pdf/State%20of%20the%20City%20Report%20FINAL%201-21-10.pdf.

[8] *Id.* at 11, 23.

[9] ESC 2011 Report at 63.

[10] As explained at ¶¶ 27-39 below, ejection of homeless youth after 30 or 60 days is illegal.

[11] New York City Council Fiscal Year 2014 Executive Budget Hearings: Joint Hearing Before the Committee on Youth Services, the Committee on Finance, and the Committee on Community Development (May 10, 2013), *video available at* http://legistar.council.nyc.gov/MeetingDetail.aspx?ID=239994&GUID=DD068265-4E8C-4251-8C85-8949A720A76B&Search= ("May 10, 2013 City Council Hearing").

13.     The New York State law governing the City's youth shelter system — The New York Runaway and Homeless Youth Act ("NY RHYA") — requires the City to provide a shelter bed and services to any homeless youth who seeks it.  Under this statute, the City is prohibited from denying youth shelter to homeless youth or ejecting homeless youth from shelter back to the street.  Yet the City does just that hundreds of times each night.

14.     The NY RHYA envisions a youth shelter system that either reunites youth with their families, or transitions them to independent living — all while providing safe and adequate shelter and other services.

15.     Despite these statutory requirements, the crisis is getting worse:  The number of City-funded youth shelter beds has dropped from 370 in 2009 to 253 today.[12]

16.     By denying youth shelter to homeless youth ages 16 to 20 and ejecting them from shelter to the street without fair process, the City violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution, the NY RHYA, the Americans with Disabilities Act, the Rehabilitation Act of 1973, and the New York City Human Rights Law.

17.     As a result of the City's illegal policies and practices concerning homeless youth ages 16 to 20, the Named Plaintiffs bring this complaint for declaratory and injunctive relief on behalf of themselves and similarly situated youth in the City to ensure ongoing access to youth shelter and services.

## JURISDICTION AND VENUE

18.     This action arises under, among other things, the Constitution and laws of the United States, including: The Fourteenth Amendment to the U.S. Constitution; The Civil

---

[12] ESC 2009 Report at 17; ESC 2011 Report at 21.

Rights Act of 1871, 42 U.S.C. § 1983; The Americans with Disabilities Act, 42 U.S.C. §§ 12117, 12132, *et seq.* (the "ADA"); and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, 794a(a)(2) (the "Rehabilitation Act").

19.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3)-(4) and 42 U.S.C. § 1983 because this action seeks redress for the violations of Plaintiffs' constitutional and civil rights.

20.     This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

21.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

22.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c).

## PARTIES

**Plaintiffs**

23.     Plaintiffs are current and future runaway and homeless youth ages 16 to 20 who seek youth shelter and services, but have been denied or are at imminent risk of being denied such shelter and services by the City.

24.     Additional facts regarding the Named Plaintiffs are set forth below at ¶¶ 101-270.

25.     Named Plaintiff D.G. is 17-years-old and has been homeless since February 2012.  Since D.G. is estranged from his parents and does not have a guardian who can assert and protect D.G.'s rights in Court, Theo Liebmann has volunteered, on a *pro bono* basis, to serve as D.G.'s "next friend" pursuant to Fed. R. Civ. P 17(c)(2).  Mr. Liebmann is the Clinical Professor and Director of Hofstra Law School Clinical Programs and serves at Hofstra

University as the Attorney-in-Charge of the Youth Advocacy Clinic and as Associate Director of the Center for Children, Families and the Law.

**Defendant**

26.     Defendant the City of New York is a government entity required to provide youth shelter and services to the City's homeless youth.  The City is a public entity within the meaning of the ADA.  *See* 42 U.S.C. § 12131(1)(A).  It receives federal financial assistance for its homeless youth programs, bringing it within the purview of the Rehabilitation Act.  *See* 29 U.S.C. § 794(a).  The City oversees DYCD, a City agency charged with administering the youth shelter system.

## LEGAL AND STATUTORY FRAMEWORK

**The New York Runaway and Homeless Youth Act**

27.     The NY RHYA confers a right to youth shelter to homeless youth in New York City ages 16 to 20.

28.     Under the NY RHYA, the City must provide youth shelter and services to any homeless youth who seeks it, without qualification.   Every time the City denies youth shelter to a homeless youth or ejects a youth from shelter to the street, it violates the NY RHYA.

29.     The NY RHYA was enacted in 1978.  It originally provided services only for youth ages 16 to 17, but it was amended in 1985 "[t]o serve older homeless youth [ages 18 to 20] and to include transitional independent living support services."[13]

30.     The NY RHYA defines a "homeless youth" as a "person under the age of twenty-one who is in need of services and is without a place of shelter where supervision and care are available."  It defines a "runaway youth" as a "person under the age of eighteen years

---

[13] Governor's Program Bill 1985 Memorandum, Governor's Bill Jacket, L. 1985, ch. 800 at 6.

6613667v.1

old who is absent from his legal residence without the consent of his parent, legal guardian, or custodian." N.Y. Exec. Law §§ 532-a(1)-(2).[14]

      31.    The NY RHYA envisions a straightforward system in which homeless youth have unfettered access to youth shelter and services. Under this system, any homeless youth is entitled to crisis shelter, which includes a bed and services such as food, clothing, medical care, education, and counseling. N.Y. Exec. Law §§ 532-b(1)(a), 532-b(1)(e). After a stay in crisis shelter, some youth will stabilize and find alternative living arrangements. For those who cannot, the NY RHYA directs that homeless youth will move into transitional independent living programs (TILs).[15] N.Y. Exec. Law §§ 532-a(6), 532-d. From there, the statute provides that these youth will transition to independent living. *Id.*

      32.    The specific provisions of the NY RHYA and applicable regulations support this scheme. The NY RHYA provides that a crisis shelter "is authorized to and ***shall*** provide assistance to ***any*** runaway and homeless youth . . . including but not limited to food, shelter, clothing, medical care, education and individual and family counseling." N.Y. Exec. Law §§ 532-b(1)(a), 532-b(1)(e) (emphases added).

      33.    Likewise, state regulations mandate that crisis shelter staff "***shall provide or assist in obtaining*** the following necessities and services for youth . . . : (i) shelter; (ii) food; (iii) clothing; (iv) individual and group counseling; (v) transportation; (vi) medical, mental health and dental care; (vii) legal assistance; and (vii) copies of miscellaneous vital documents such as

---

[14] This Complaint adopts the definitions of the terms "runaway" and "homeless" used in the NY RHYA. N.Y. Exec. Law §§ 532-a(1)-(2).

[15] TILs are transitional independent living support programs, which are supposed to provide longer-term shelter to homeless youth after crisis shelter. *See* N.Y. Exec. Law §§ 532-a(6), 532-d.

6613667v.1

birth certificates, social security cards, and education records."  9 N.Y.C.R.R. § 182-1.9(e) (emphasis added).

34.     State regulations further provide that a youth "*shall have access to services*" in residential programs (*i.e.*, crisis shelters and TILs), except in limited circumstances when the youth:  "(1) is likely to cause danger to himself/herself or others or substantially interfere with the health, safety, welfare or care of other residents; (2) is in need of a level of medical, mental health, nursing or other assistance that cannot reasonably be provided through the resources available to the program; or (3) consistently refuses to comply with the policies, procedures, and rules of the program, after all reasonable efforts are made and documented by program staff to assist the youth in adjusting to program requirements."  9 N.Y.C.R.R. §§ 182-1.9(b)(1)-(3), 182-2.9(b)(1)-(3) (emphasis added).

35.     For *runaway* youth only, the statute prescribes a 30-day limit on the length of stay in crisis shelter, so that "arrangements can be made for the runaway youth's return home, alternative residential placement pursuant to [the foster care laws], or any other suitable plan."  N.Y. Exec. Law § 532-b(2).  With the consent of DYCD and the youth's parent, guardian, or custodian, the runaway youth may remain in crisis shelter for up to 60 days.  *Id.*

36.     The NY RHYA provides no such limits on crisis-shelter stays for *homeless* youth.  To the contrary, the New York legislature has recognized that short-term shelter stays fail to meet the needs of homeless youth:

> The Runaway and Homeless Youth Act, enacted in 1978, was designed to serve the "typical" *runaway youth* who, after a cooling off period and with supportive counseling at a shelter, could return to his family within a short period.  The law provides for 30-60 day crisis care programs.  *These programs have not met the needs of those homeless youth who cannot or will not return home.*  Thirty-seven percent of the young people served by current programs are returned to unstable living situations without

6613667v.1

adequate shelter, food or income.  Without assistance in their
transition to adulthood, many of these young people encounter
difficulties at work or at school and are unable to obtain necessary
services to sustain independent living.[16]

37.     Accordingly, the statute authorizes TIL programs to provide longer-term

shelter for homeless youth who do not have alternate living arrangements.  It provides that

"residential facilities operating as transitional independent living support services are authorized

to and ***shall***: (a) ***provide shelter*** to homeless youth between the ages of sixteen and twenty-one as

defined in this article."  N.Y. Exec. Law § 532-d (emphases added).  Thus, the statute mandates

the availability of TILs and longer-term shelter options for homeless youth.

38.     The statute does not permit the City to discharge runaway or homeless

youth from shelter back to the street under any circumstance.  For runaway youth, the statute

requires reunification with family, foster care placement, or housing according to any other

suitable plan upon discharge from crisis shelter.  N.Y. Exec. Law § 532-b(2).  For homeless

youth, the statute permits them to remain in crisis shelter until they secure a bed in a TIL

program or find suitable shelter elsewhere.  N.Y. Exec. Law §§ 532-a(6), 532-d.  In enacting the

1985 amendments, the legislature recognized and sought to avoid the harm that youth experience

from cycling in and out of shelter:

The only way the cycle of providing crisis care and then
discharging youth back to the streets can be broken is to provide a
significant number of programs which address the transitional
service needs of older homeless youth.[17]

39.     The system required by the NY RHYA is supposed to "enable homeless

youth between the ages of sixteen and twenty-one to progress from crisis care and transitional

---

[16] Governor's Program Bill 1985 Memorandum, Governor's Bill Jacket, L. 1985, ch. 800 at 6
(emphases added).

[17] *Id*. at 7.

care to independent living." N.Y. Exec. Law § 532-a(6). The City's denial of shelter to homeless youth and its ejection of homeless youth from shelter to the street perpetuates the very cycle of homelessness that the NY RHYA was designed to curtail.[18]

**Fourteenth Amendment of the U.S. Constitution**

40.     The Fourteenth Amendment of the U.S. Constitution requires that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Homeless youth have a property interest in shelter under New York State law, including the NY RHYA. New York courts have interpreted New York State law to afford homeless individuals a right to shelter. The NY RHYA itself mandates that the City must provide shelter to any homeless youth who needs it. N.Y. Exec. Law §§ 532-b(1)(a), 532-b(1)(e). The City may not deprive homeless youth of shelter without fair process, including notice and an opportunity to be heard.

41.     The Equal Protection Clause of the Fourteenth Amendment requires that no state "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The City currently provides shelter to homeless adults over 18 and homeless families, but not to homeless youth ages 16 to 17 without families. The City does not have a rational basis for treating these groups differently.

**Americans with Disabilities Act**

42.     Title II of the ADA (1) prohibits the City from discriminating against individuals with disabilities in accessing public services (either intentionally or through policies with a discriminatory impact), and (2) requires the City to provide reasonable accommodations

---

[18] The scheme contemplated by the NY RHYA is further supported by the federal Runaway and Homeless Youth Act of 1978, which mandates that services provided to runaway and homeless youth under the act "***shall include*** (i) safe and appropriate shelter." 42 U.S.C. § 5711(a)(2)(B)(i) (emphasis added). The City receives funding under this Act.

that would allow individuals with disabilities to access such services.  42 U.S.C. §§ 12131-12132; 28 C.F.R. § 35.130(b)(7).  The City's policies with respect to homeless youth have a disparate impact on youth with mental disabilities.  The City does not assist youth with disabilities in accessing shelter and services.

## FACTUAL ALLEGATIONS

**Background**

43.     Plaintiffs are current and future runaway and homeless youth in New York City ages 16 to 20 who seek shelter and services but cannot obtain either.

44.     DYCD is a New York City agency.  Under the New York City Charter, DYCD is the "county youth bureau" for the five boroughs of New York City.  New York City Charter § 733.  DYCD is therefore responsible for the City's youth shelter system.

45.     DYCD administers and funds a decentralized network of homeless youth shelter providers.  The providers operate crisis shelters and TILs, as well as drop-in centers where youth can seek services.  Through their contractual obligations, the providers operate at the control and direction of the City.

**Lack of Crisis Shelter Beds**

46.     Thousands of homeless youth sleep on the New York City streets each night — in parks, abandoned buildings, subway cars, and on the sidewalk.

47.     The City funds 112 youth crisis shelter beds.

48.     Each night, homeless youth seeking access to crisis shelters are turned away and put on waiting lists.  Sometimes, the waiting lists are so long that homeless youth must wait before they can even add their names.

6613667v.1

49.    Crisis shelters have reported over 100 youth on their waiting lists at a time, and the lists show no signs of shrinking.  One crisis shelter reported 199 more youth on its waiting list in 2011 than in 2010, a 40% increase.[19]  Youth can wait weeks or months to access a bed.  Many homeless youth who seek crisis shelter in the City will never obtain it.

50.    The City is aware that youth are routinely shut out of crisis shelters.  On December 12, 2013, City Council member Lewis Fidler described the dire shortage of youth crisis beds in New York City:

> You all know the data—3,800 kids sleeping on the streets; hundreds of shelter beds means that there are waiting lists.  I got a letter from the [a shelter provider] . . . telling me that they have 170 kids on the waiting list right now.  You know, that's 170 kids who are going to sleep on the subway grating tonight.[20]

51.    At a City Council meeting in June, Creighton Drury, Executive Director of Covenant House, a crisis shelter, testified that it turns away 200 to 400 youth each month.[21]

52.    The City has admitted that it does not provide enough crisis beds to accommodate all homeless youth ages 16 to 20.

53.    DYCD Commissioner Jeanne Mullgrav has testified before the City Council that hundreds of homeless youth are denied youth shelter by the City each night.[22]

---

[19] Lila Shapiro, *New York Homeless Youth Budget Restored But Worries Linger*, Huffington Post (June 28, 2012), *available at* http://www.huffingtonpost.com/2012/06/27/homeless-youth-budget-new-york_n_1628822.html.

[20] Dec. 12, 2013 City Council Hearing.

[21] New York City Council Hearing: Oversight—The Prevalence of Sex and Labor Trafficking Among New York City's Homeless Youth Population (June 11, 2013), *available at* http://legistar.council.nyc.gov/MeetingDetail.aspx?ID=243554&GUID=2234351B-DE7E-487F-8B30-074D3C88D07D& ("June 11, 2013 City Council Hearing").

[22] May 10, 2013 City Council Hearing.

6613667v.1

54.     Deborah Harper, DYCD Assistant Commissioner for Vulnerable & Special Needs Youth, has testified before the City Council that homeless youth age 18 and over are referred to adult shelters when they cannot be accommodated in youth crisis shelters.[23]

55.     When homeless youth are denied access to shelter, they receive no written notice of the denial or any opportunity to challenge it.

56.     Even if a youth obtains a crisis shelter bed, the City ejects the youth from shelter after 30 days.  Shelter providers can apply for extensions that permit youth to stay in crisis shelter for up to 30 additional days, but the maximum stay that the City permits is 60 days.

57.     The City admits that it caps youth crisis shelter stays at 60 days:  "Crisis Shelters (shelters) are voluntary, short-term residential programs for youth up to age 21, housing youth for up to 30 days, with possible extensions, granted by DYCD, for up to 30 days more."[24]

58.     There is no City policy or procedure permitting youth to challenge their ejection from crisis shelter.

59.     When homeless youth are discharged from crisis shelter, they often do not have anywhere to live but the street.  Their only option is to go back on the waiting list for crisis shelter, but there is no guarantee that a bed will be available.

---

[23] New York City Council Hearing: Oversight—Mental Health Services for Runaway and Homeless Youth," Committee on Youth Services Jointly with the Committee on Mental Health, Mental Retardation, Alcoholism, Drug Abuse and Disability Services (December 14, 2012) (testimony of Deborah Harper, DYCD Assistant Commissioner for Vulnerable & Special Needs Youth), *video available at* http://legistar.council.nyc.gov/MeetingDetail.aspx?ID=220010&GUID=93037B76-D5FD-4BF6-B840-309DAA44BDDF& ("Dec. 14, 2012 City Council Hearing").

[24] Jeanne B. Mullgrav, Commissioner, *CONCEPT PAPER for Residential and Non-Residential Runaway and Homeless Youth Services* ("DYCD Concept Paper") at 9, NYC Department of Youth & Community Development (April 5, 2013), *available at* http://www.nyc.gov/html/dycd/downloads/pdf/concept_papers/rhy_concept_paper.pdf.

6613667v.1

60.     For runaway youth, the situation is just as dire.  The City designates very few of the 112 crisis shelter beds for runaway youth.  It often does not permit runaway youth to stay in crisis shelter for even 30 days.

61.     When the City discharges runaway youth, it does not find them alternative housing as required by the NY RHYA, but rather ejects them back to the street.

**Lack of TIL Beds**

62.     While in crisis shelter, homeless youth are eligible to apply for TILs. TILs are DYCD-funded residential facilities intended to assist homeless youth transition to independent living.[25]

63.     The TIL application process requires applicants to submit a mental health evaluation, even though the City does not provide funding for such evaluations.  The application also requires youth to demonstrate that they are either enrolled in school or employed.

64.     The City has acknowledged that "TILs may refuse referrals only on the limited grounds indicated in the RHY [runaway and homeless youth] regulations."[26]  However, TILs routinely reject applications for grounds ***not*** indicated in the regulations, including past behavioral issues, substance abuse, or any mental health diagnosis, including depression.

65.     The City has further acknowledged that "[i]n cases where there is no independent psychiatric evaluation or other documentary proof demonstrating unsuitability, the

---

[25] N.Y. Exec. L. §§ 532-a(6), 532-d(a).  *See also* DYCD Concept Paper 10 ("**Youth are eligible to enter to a TIL program only through a referral from a DYCD Crisis Shelter or with DYCD approval**.") (emphasis in original).

[26] DYCD Concept Paper at 11; *see also* 9 N.Y.C.R.R. § 182-2.9(b)(1)-(3).

6613667v.1

TIL will accept the youth, and, following enrollment, seek the necessary specialist assessment."[27] But youth without independent psychiatric evaluations are regularly *not* accepted to TILs.

66.     Homeless youth have no opportunity to challenge a denial of their TIL applications.  When the City rejects a TIL application, it does not find somewhere else for the youth to go following discharge from crisis shelter.  More often than not, the City will discharge the youth to the street.

67.     Even if a youth is able to complete a TIL application and gain acceptance while in crisis shelter, there is no guarantee that a TIL bed will be available.  The City provides roughly 140 TIL beds for the City's homeless youth.  Waiting lists to access these beds are long.  In the interim, unless a homeless youth can find shelter elsewhere, the youth must wait for the TIL bed on the street.

68.     Only nine percent of homeless youth discharged from crisis shelters in 2010 were discharged to a TIL.[28]

69.     Once admitted, TILs impose strict compliance rules on residents.  In many instances, these rules are too burdensome for homeless youth.  TILs eject homeless youth who fail to comply with program requirements.

70.     When the City ejects a homeless youth from a TIL, it does not make alternative arrangements for that youth.  The youth will typically be ejected back to the street.

71.     There is no City policy or procedure for homeless youth to challenge ejection from a TIL.

---

[27] DYCD Concept Paper at 11.

[28] New York State Office of Children & Family Services, *Runaway and Homeless Youth: Annual Report 2010*, *available at* http://ocfs.ny.gov/main/reports/2010%20RHYA%20Summary%20 Report.pdf.

6613667v.1

**Lack of Other Options**

*ACS*

72.     For runaway and homeless youth ages 16 to 17, DYCD-funded shelters are the only City shelter options they are eligible for.

73.     Because they are under 18, these youth are eligible to be taken into state custody by the Administration for Children's Services ("ACS") if they have experienced abuse or neglect.  ACS is responsible for performing the duties assigned to local social services districts in Article 6 of the New York Social Services law and Article 10 of the New York State Family Court Act.  *See* N.Y. Soc. Serv. L. § 397; N.Y. Fam. Ct. Act § 1011.

74.     The New York City Charter provides that "[t]he [ACS] commissioner shall have the power to perform functions related to the care and protection of children including, but not limited to . . . performing the functions of a child protective service, including without limitation, the receipt and investigation of reports of child abuse and maltreatment; . . . [and] providing suitable and appropriate care for children who are in the care, custody, or guardianship of the commissioner."  New York City Charter § 617.

75.     If a crisis shelter provider suspects that a homeless or runaway youth ages 16 to 17 has been abused or neglected, the provider must refer that youth to ACS.  ACS is supposed to investigate claims of abuse or neglect of any youth under age 18 and take appropriate action if it confirms abuse or neglect.

76.     ACS routinely fails to investigate claims of abuse or neglect relating to runaway and homeless youth ages 16 and 17 because the families who reject them contend that the youth can return home — even though conditions at home may be impossible for the youth to

endure.  When ACS does investigate these claims, it regularly fails to find abuse or neglect even when there is evidence that it exists.

77.     When ACS refuses to investigate claims of abuse or neglect relating to runaway and homeless youth ages 16 and 17, or when it improperly finds that no abuse or neglect exists, these youth have no options other than the youth shelter system or the street.

### Adult Shelter System

78.     Youth ages 18 to 20 are eligible to access adult shelters, but in effect they are barred from this alternative by the Department of Homeless Services ("DHS").

79.     DHS regularly turns youth 18 to 20 away from adult shelters and instructs them to go to youth crisis shelters run by DYCD.  DHS is aware of the bed shortage at these youth shelters.  When DHS sends a youth to a crisis shelter, it does so with knowledge that the youth will likely have to wait for a bed.

80.     Youth ages 18 to 20 who are turned away from adult shelters sometimes can still access them with assistance from advocacy groups like Coalition for the Homeless. Coalition staff regularly receive calls reporting that youth have been turned away from DHS shelter.  A significant number of these calls occur in the middle of the night or very early hours of the morning.  Whenever Coalition staff receive such calls, they immediately contact DHS to secure beds for these youth.  Inevitably, however, many youth do not have the resources or knowledge to access this level of advocacy and end up back on the street.

81.     Adult shelters are also not viable alternatives for youth ages 18 to 20 because these shelters do not provide youth-specific services that youth crisis shelters are required to provide.

6613667v.1

82.     The City is aware that homeless youth cannot obtain the shelter and services they need at adult shelters.  At a May 10, 2013 City Council hearing, City Council member Lewis Fidler stated that "many [homeless youth] would rather sleep on the subway than go into the adult shelter system."[29]  Many youth are afraid to enter these shelters.

*Supportive Housing*

83.     In addition to adult shelters, supportive housing is theoretically a long-term housing option for homeless youth ages 18 to 20 with mental health disabilities.  But homeless youth are also effectively barred from this alternative.

84.     The City provides supportive housing through its New York, New York I, II, and III programs ("NY/NY" programs).  To qualify for a bed in the NY/NY I or II programs, a youth must have a severe and existing mental health disability.  To qualify for a bed in the NY/NY III program, a youth must have (1) been in foster care for one or more years after his or her sixteenth birthday, (2) have left foster care within the past two years, or (3) have a serious and present mental health disability.

85.     Out of the 10,000 supportive housing beds for individuals with mental health diagnoses in New York City, only 22 are specifically reserved for youth.  To gain entry to supportive housing, homeless youth must supply documentation of being homeless for at least one year.  For many homeless youth (especially those with mental health disabilities), documenting a year of homelessness may be difficult if not impossible.

86.     Homeless youth must also prove they have a mental health disability significant enough to warrant supportive housing.  The City does not fund mental health

---

[29] May 10, 2013 City Council Hearing.

evaluations in crisis shelters.  Instead, homeless youth must access mental health evaluations on their own.  Homeless youth must also provide proof of income.

87.     There are no supportive housing beds available for homeless youth raising children.

**Mental Health Disabilities of Plaintiffs**

88.     An overwhelming majority of homeless youth ages 16 to 20 in New York City suffer from mental health disabilities.

89.     In 1992, one of the largest studies of homeless youth in New York City revealed that 90% met the Diagnostic and Statistical Manual of Mental Disorders (DSM) criteria for an emotional or behavioral disorder.  Three-quarters of these youth met the criteria for a mood disorder, 41% had considered suicide, and 25% had attempted suicide.[30]  These findings were confirmed by a 2007 study of homeless youth, which found them to be at significant risk for post-traumatic stress disorder ("PTSD") and anxiety disorders.[31]

90.     The number of homeless youth with mental health disabilities in New York City is likely underreported.  Few homeless youth have official diagnoses of mental health disabilities, though a majority report symptoms of it.  For example, in 2010, only 7% of homeless youth in the City reported receiving a diagnosis of depression, but approximately 50% reported various symptoms of it.[32]

91.     As a result of their mental health disabilities, many homeless youth have difficulty with one or more major life activities, such as seeking employment, enrolling in

---

[30] ESC 2001 Report at 63.

[31] Marya Viorst Gwadz et al., *Gender differences in traumatic events and rates of post-traumatic stress disorder among homeless youth*, 30 Journal of Adolescence 117 (February 2007).

[32] Covenant House Institute, *Youth in Crisis: Characteristics of Homeless Youth Served by Covenant House New York* at 7 (March 2009).

school, or applying for housing.  Many homeless youth also have difficulty travelling around the City.

92.     The City is aware that there is a high incidence of mental health disabilities among homeless youth.  At a City Council hearing on December 14, 2012 at which DYCD executives were present, City Council member G. Oliver Koppel described the alarming rate at which homeless youth in New York City suffer from mental health disabilities:

> Mental disorders affect the RHY population at a much higher rate. Research reveals that RHY exhibit psychiatric disorders at a level six times greater than the general youth population.  It's estimated that between 66 and 89 percent have symptoms of one or more psychiatric disorders.  Self-harming behaviors are also far more prevalent in the RHY population. . . .  About four times higher than the non-RHY youth population.  The risk for developing mental health disorders is especially strong for the LGBTQ — studies show that they are twice as likely to attempt suicide as compared to heterosexual homeless youth.  Suicide is the leading cause of death among homeless youth.[33]

93.     The City is also aware that the services it provides for this population are insufficient.  City Council member Lewis Fidler stated at the same hearing that "[i]n our efforts to assist these young people into a transition into a normal, healthy, and productive adult life, other services are needed.  At the top of that list are mental health services."[34]

94.     The City does not help homeless youth who have mental health disabilities navigate the youth shelter system.  For instance, the City does not assist these youth in accessing shelter and services.  Nor does it permit these youth to remain in crisis shelter until they obtain longer-term placements in TILs.

---

[33] Dec. 14, 2012 City Council Hearing.

[34] *Id.*

95.     Many homeless youth also experience trauma before entering the youth shelter system.  For example, of youth ages 18 to 21 who entered the Covenant House crisis shelter between October 2007 and February 2008, 37% said they had been victims of physical abuse.  Nineteen percent said they had endured sexual abuse.  Forty-one percent reported witnessing violence in their homes.[35]

**Harms Faced By Homeless Youth**

96.     The City's denial of youth shelter to homeless youth ages 16 to 20 inflicts grave and irreparable harm.  Homeless youth who sleep on the street are vulnerable to extreme weather and resulting illnesses, including frostbite, hypothermia, and pneumonia — any of which could require hospitalization.

97.     Homeless youth are also likely to become victims of violence and sexual assault.  They are also pressured to trade sex for a place to sleep or shower.  About one-third to half of homeless youth (both men and women) exchange sex for money, food, or a place to stay.  Many are victims of sex trafficking.   Each night, an estimated 150 homeless youth are forced to perform sex work.[36]  These dangers are compounded by a heightened risk of sexually transmitted diseases, including HIV.  In 2009, an estimated 10% to 30% of homeless youth in the City were infected with HIV.[37]

---

[35] Covenant House Institute, *Youth in Crisis: Characteristics of Homeless Youth Served by Covenant House New York* at 4 (March 2009).

[36] ESC 2008 Report.

[37] ESC 2009 Report at 37.

used

98.     The longer that youth remain homeless, the more difficult it is for them to successfully engage in structured, productive activity, such as enrolling in school or maintaining a job.[38]  By one estimate, 25% of homeless youth will attempt suicide.[39]

99.     For homeless youth suffering from mental illness, surviving on the streets and having no access to mental health treatment exacerbates their symptoms and makes finding permanent shelter less likely.  The City's denial of shelter to homeless youth ages 16 to 20 causes additional harm to this already vulnerable group each day.

100.     The City is aware of the harm faced by homeless plaintiffs.  Deborah Harper, DYCD Assistant Commissioner for Vulnerable & Special Needs Youth, testified at a City Council hearing that "[y]oung people on the streets are at particular risk of becoming victims of sexual exploitation, abuse, and other dangers."[40]

## FACTUAL ALLEGATIONS ABOUT NAMED PLAINTIFFS

**Named Plaintiff C.W.**

101.     C.W. is a 19-year-old homeless youth who identifies as gender nonconforming[41] and a lesbian.  C.W. grew up in New York, New York.

102.     C.W. is currently staying at a TIL.  The City offered C.W. this shelter placement only after receiving a December 2, 2013 demand letter from Plaintiffs' attorneys threatening this litigation.

---

[38] ESC 2009 Report at 11, 23.

[39] ESC 2011 Report at 63.

[40] Dec. 14, 2012 City Council Hearing.

[41] The term "gender nonconforming" means that the individual does not identify as male or female.

103.    If C.W. is discharged from the TIL, C.W. will have no place to go other than the street.

104.    C.W. has been homeless for several years.  C.W.'s mother died when C.W. was about 6 years old.  Starting in about 2006, C.W. lived with C.W.'s father in three different family homeless shelters operated by DHS.  C.W. has a difficult relationship with C.W.'s father, in part due to C.W.'s father's relationship with a woman.  The woman threatened and beat C.W. and also once held a knife to C.W.'s face.  C.W.'s father never intervened or protected C.W. from the abuse.

105.    C.W. left the family shelter system around February 2013 because C.W. feared being jailed for C.W.'s father's deceitful behavior, which included lying to DHS about stolen money.  When C.W. left family shelter, a DHS employee told C.W. that C.W. would be banned from DHS shelters in the future because of C.W.'s father's actions.

106.    In approximately March 2013, C.W. moved into a youth crisis shelter where C.W. stayed for about five months.

107.    While in crisis shelter, C.W. completed a TIL application and was accepted.  But because the TIL had no available beds, C.W. was placed on a waiting list.

108.    While waiting for a TIL bed to open, C.W. was discharged from the City youth crisis shelter with nowhere to go.  C.W. spent several nights sleeping on the street, mostly in parks.  C.W. eventually found a bed at a second crisis shelter where C.W. stayed for about a month before being discharged back to the street.  C.W. still had not heard about the TIL bed.

109.    During C.W.'s stay at the second crisis shelter, C.W. signed up to get back into the first crisis shelter, which C.W. felt was more accepting of C.W.'s gender identity and

24

expression.  The City placed C.W. on a waiting list.  A couple of months after discharge from the second shelter, C.W. was finally told that a bed in the first shelter had opened.

110.    During the months after C.W. was accepted to a TIL, no one contacted C.W. about C.W.'s status on the waitlist.  After returning to the first crisis shelter, C.W. watched as other youth who were accepted to TILs after C.W. obtained TIL beds.  The crisis shelter staff told C.W. that C.W. did not obtain a placement sooner because C.W. was not living in the crisis shelter while on the waiting list.

111.    C.W. has been diagnosed with severe depression, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD").  C.W. was first diagnosed with depression around age five.  C.W. has been prescribed Abilify, an anti-psychotic medication, but C.W. has been unable to obtain an adjusted dose that was prescribed after C.W. experienced side effects.  C.W. participates in counseling every week at a City drop-in center that serves runaway and homeless youth.

112.    C.W. has never applied for supportive housing, but is undergoing additional mental health evaluations in order to complete an application.  C.W. is also in the process of applying for Supplemental Security Income ("SSI").

113.    C.W. has finished high school and is now enrolled in a job readiness program.  C.W. is trying to find a job.

114.    C.W. is able to eat meals at the crisis shelter, but the shelter does not provide  C.W. with clothes that fit.

115.    C.W. wishes to remain anonymous in this litigation to maintain privacy.

116.    C.W. does not want homelessness to define the rest of C.W.'s life.

**Named Plaintiff D.S.**

117.    D.S. is a 20-year-old homeless male from Brooklyn, New York.

118.    D.S. is staying at a City youth crisis shelter.  D.S. was discharged from a crisis shelter in December 2013, but the City admitted him to different crisis shelter after receiving a December 2, 2013 letter from Plaintiffs' attorneys threatening this litigation.

119.    If the City had not permitted D.S. to re-enter crisis shelter, he would have had to sleep on the street.  If D.S. is discharged from crisis shelter, he will have nowhere to go.

120.    D.S. became homeless at 17 because his mother moved out of the City and did not take him with her.  D.S. does not have a relationship with his father or any other family members.  At the time D.S.'s mother left, he had almost finished high school.  Despite not knowing where he was going to sleep each night, D.S. graduated in 2011.

121.    Since becoming homeless, D.S. has slept in many places.  He first stayed at a City youth crisis shelter in December 2011, shortly after becoming homeless.  D.S. has slept in City youth crisis beds six separate times for at least 30 days.  He has stayed in two different crisis shelters.  When not in crisis shelters, D.S. has slept on the floors and couches of friends and on the subway.  For a couple of months when he could work full time, D.S. rented a room in an apartment.

122.    D.S. has significant experience with the youth shelter system in the City. He has been on waiting lists for crisis beds many times, and he has followed up with crisis shelters every day to increase his chances of sleeping in a bed.  Crisis shelters have made D.S. wait days before allowing him to sign up for the crisis bed waiting list.

123.    In the spring of 2013, while staying in a youth crisis shelter, D.S. applied for a TIL placement and was accepted.  D.S. lived in the TIL from May 2013 until July 2013.

The TIL ejected D.S. to the street July 2013 because he could not save enough money to satisfy the program rules.

124.     D.S. was under constant stress while living in the TIL because the TIL imposed strict rules.  For example, D.S. was required to save 50% of his paycheck.  But the TIL did not provide any assistance with travel to and from work, D.S. was forced to spend a significant amount of his earnings on transportation.  This expense made it impossible for D.S. to save half of his paycheck to comply with program rules.  As a result, he was discharged from the TIL.

125.     D.S. has worked off and on since he was 17.  The TIL where D.S. stayed required residents to work full-time jobs, but D.S. found it difficult to find and maintain a full-time job without stable housing.  D.S. was able to find and retain a part-time job, but the TIL required D.S. to continually search for full-time work and document every job that he applied for.  These combined efforts took up almost all of his time.

126.     The TIL provided food to D.S. and other residents, but only at certain, pre-scheduled times.  Between his active job search and work schedule, there were many days when D.S. could not make it back to the TIL in time to eat.  As a result, D.S. had to spend the little money he had on food.  Sometimes he went hungry.

127.     While living at the TIL, D.S. often felt exhausted and overwhelmed.  He was constantly worried about making a mistake, receiving a penalty, and being asked to move out.  D.S. felt as though he was expected to do a lot without getting the required support and assistance.  Simple things like eating meals within the TIL's pre-determined hours became difficult given his work hours.  Over time, D.S. felt as though it would be impossible to succeed living in such an environment.

128.    Although D.S. is over 18, he has never stayed in an adult shelter.  D.S. went to Bellevue men's shelter one evening, but he was required to wait all night to go through intake.  D.S. left at 8:00 a.m. after he did not receive a bed.  It is D.S.'s experience that the youth shelters are more hospitable and able to provide some support, although it is not enough.

129.    D.S. does not want to be homeless.  He wants to work a full-time job and save enough money to find a stable home environment and continue his education.

130.    D.S. wishes to remain anonymous in this litigation because he does not want his homelessness to affect his future job prospects.

**Named Plaintiff M.C.**

131.    M.C. is 20 years old.  He is a homeless, transgender male who is originally from the Bronx, New York.

132.    M.C. is currently couch surfing.

133.    M.C. does not have a permanent place to stay, and he does not know where he will sleep on a nightly basis.

134.    M.C. has been homeless since February 2011, when he left home because his stepmother would not accept his gender identity.  His stepmother told him to leave the apartment and stay at a youth shelter.  He was 17.

135.    M.C.'s father passed away in November 2009.  His biological mother has not cared for him since he was five months old.

136.    Since becoming homeless, M.C. has shuffled in and out of City youth crisis shelters.  The first time he tried to obtain a City crisis bed, he waited three days before he was given a bed.  He stayed for about 30 days, until the City youth shelter told him to leave.

137.    Over the past two years, M.C. has gone to crisis shelters on multiple occasions.  The City's youth crisis shelters have regularly told him that they do not have any beds available.  Sometimes, M.C. has put his name on a waiting list.  Other times, he has been told that he needed to wait before he could even join a waiting list.

138.    In October 2013, M.C. tried to obtain a bed in a City youth crisis shelter, but he was told that he was ineligible to join the waiting list because he was previously accused by the shelter of possessing contraband.  There was no procedure for him to challenge the accusation, and M.C. had to wait 30 days before he could rejoin a waiting list for a crisis shelter.

139.    When not staying at a crisis shelter, M.C. has tried to stay with family members or friends, but they have not allowed him to stay for long.

140.    M.C. has visited one drop-in center and one crisis shelter where he feels comfortable expressing his gender identity and sexual orientation.  He has heard stories of lesbian, gay, bisexual, and transgender youth being harassed at other shelters.

141.    M.C. has started applications for TILs more than once, but he has never remained in a crisis bed long enough to complete an application.

142.    M.C. has been diagnosed with ADHD and bipolar disorder.  He receives SSI payments because of these disorders, but they are sent to his stepmother's home rather than to him.  He relies on his stepmother to send him the payments.

143.    M.C.'s ADHD and bipolar disorder make it more difficult to him to apply to TILs.  He cannot access regular mental health treatment or therapy, but he tries to see a psychiatrist at the youth shelter when she is available.

144.    M.C. has health insurance through MetroPlus, but he receives most of his medical treatment through the Montefiore Hospital medical van.  M.C. has been studying to take

his general education diploma ("GED") test, but has been unable to schedule a final test date because he wants to secure a steady place to sleep before taking the test.

145.    M.C. wishes to remain anonymous in this litigation because he does not want others to learn that he is homeless.

**Named Plaintiff A.H.**

146.    A.H. is a 20 year-old African American, bisexual female from Queens, New York.  She has been homeless for about 17 months.

147.    Before becoming homeless, A.H. lived with her parents in Queens.  A.H.'s mother had threatened to kick her out of their home for years.  She would put A.H.'s belongings in the hall outside of their apartment and refuse to let A.H. inside.  In July 2012, A.H. packed a bag and left for good.

148.    At first, A.H. was afraid to tell other family members that her mother had kicked her out.  She did not want her parents to look bad, and she was afraid that her mother would turn off her cell phone.  As a result, she could not live with other family members and she did not know of any other places to sleep.

149.    A.H. found a young woman to stay with temporarily, but she quickly realized that she needed to earn money.  Because she did not have a high school diploma or any work experience, A.H. did not know how she would make enough money to survive.

150.    With nowhere else to turn, A.H. became a sex worker at 19.   She was introduced to her trafficker through her roommate, who was also a sex worker.  Though she felt scared, A.H. believed that sex work was the only way to survive.  The fact that her roommate was also involved with sex work made the transition easier.

151.    During the summer of 2012, A.H. traveled up and down the east coast performing sex work for the trafficker.  Every time A.H. tried to get away, her roommate would threaten to kill her and her family if she left, with help from the trafficker's brother.

152.    Eventually, A.H. could not cope with the horror of her work.  One day, A.H. left a hotel room in Delaware and wandered up the street.  She did not care what happened to her because she considered death better than sex work.  Her roommate called the police and said that A.H. was planning to jump off a bridge.  The Delaware police picked up A.H., and her mother came to get her.

153.    Though A.H. was happy to be free from sex trafficking, she still did not feel safe or cared for in her mother's apartment.  A service provider who works with sexually exploited youth helped A.H. move into a shelter in Westchester County, New York.

154.    A.H. stayed at the Westchester shelter between September and December 2012.  She tried to get her life on track.  She found a retail job at a nearby mall, which allowed her to earn some money and gain work experience.

155.    Because she knew she could not stay at the shelter for long, A.H. applied to a TIL program in New York City.  She still was on the waiting list for a TIL placement when she was discharged from the Westchester shelter.  A.H. had nowhere to go.

156.    From December 2012 through July 2013, A.H. lived and slept on the streets of New York City.  She regularly slept on the 2 train and on the couches of family members and friends.  She felt depressed and worthless — she describes this as one of the worst times of her life.

157.    In July 2013, A.H. was accepted into a TIL for girls who have been trafficked.  She still lives in this TIL, but she will be discharged when she turns 21 in January

2014.  A.H. has applied to one private housing program and to New York City's supportive housing program.  If these programs do not accept A.H. before she turns 21, she will have nowhere to go when she is discharged but the street.

158.    A.H. has dealt with a host of mental illnesses since childhood.  When A.H. was a child, a close relative sexually molested her.  This experience, combined with anxiety at home life and school, led A.H. to try to commit suicide.  A.H. has tried to kill herself several times.

159.    A.H. was diagnosed with clinical depression when she was nine.  She was hospitalized numerous times as a child and adolescent, and lived for a short time at a mental health hospital for children.  In high school, she was classified as needing special education based on her mental health needs.  Around November 2012, she was diagnosed with bipolar disorder.

160.    A.H. currently meets with a therapist at an adolescent health center.  The therapist has helped A.H. process and work through the events and difficulties of her childhood.

161.    Over the years, A.H. has taken various medications, including Abilify, Wellbutrin, and Prozac.  These medications have caused her to experience seizures, so she has to be carefully monitored if a doctor prescribes them.  A.H. believes that her mental health issues often prevent her from being productive.

162.    A.H. is frustrated by the City's homeless youth shelter system because her diagnoses both disqualify her from some housing options (like many TILs), or are not severe enough to allow her to apply to other housing options (like supportive housing programs).  The few programs she does qualify for have no openings, and the waiting lists are long.

163.    Despite many hurdles, A.H. earned her GED.  She is scheduled to begin classes at a community college in January 2014 — at approximately the same time that she will be discharged from shelter.  A.H. has obtained her security license, and is currently interviewing for jobs so that she can earn money while in school.

164.    A.H. wishes to remain anonymous in this litigation because she does not want her status as a plaintiff to be used against her.  She does not want anyone who looks her up on the Internet to learn her story.

**Named Plaintiff S.G.**

165.    S.G. is an 18-year-old black female from Queens, New York.  She is currently sleeping at a DHS family shelter in the Bronx, New York.  S.G. lives with her twin infant sons and her partner, who is the father of her children.

166.    S.G. has not lived with her family since she was 12.  In the summer of 2007, she left the home where her mother, stepfather, sister, and niece lived in Queens.  Her family has inflicted physical and emotional abuse on her.

167.    When she left home, S.G. and a friend began sleeping on the E train, in staircases of various buildings in Queens, and anywhere they could find space on a couch or floor.  She felt embarrassed and scared.  She was desperate for food, shelter, and other basic needs.

168.    Shortly after she turned 13 in August 2007, another teenage girl introduced S.G. to the man who would sexually exploit her and control her life for the next four years.  S.G.'s sexual trafficker offered her clothing, a place to sleep, food, and money.  S.G. soon realized that she was expected to provide sex in exchange for support.  Her trafficker also forced

her to engage in sex acts with others.  S.G. repeatedly tried to escape, but her trafficker violently threatened her, beat her, and physically prevented her from leaving.

169.    S.G. was arrested for prostitution when she was 14.  Her case was heard in Family Court because she was a minor.  S.G. insisted that she could not return to her mother's home because she had suffered years of abuse there.  The court placed S.G. on probation and sent her to her mother's home anyway.  S.G. left the next day.

170.    S.G was rearrested soon after.  This time, the Court sent S.G. to a supportive group home for girls who are victims of sexual trafficking.  After leaving the group home, she was placed in the custody of the New York State Office of Children and Family Services ("OCFS") at the Staten Island Residential Placement for Girls.

171.    When S.G.'s placement in Staten Island ended in September 2011, OCFS discharged her to a TIL that specializes in supporting young women and girls who have been sexually trafficked.

172.    About five months after S.G. moved into the TIL, S.G.'s trafficker found out where she attended school and kidnapped her.  After he kidnapped her, the trafficker found out the location of the TIL.  Because the TIL location must be kept confidential to protect its residents, S.G. was not permitted to reside in the TIL after she was recovered from her abduction.

173.    While at the TIL, S.G. repeatedly sought assistance from ACS.  The TIL staff called ACS multiple times, asking the agency to investigate S.G.'s mother and to place S.G. in foster care.

174.    ACS never helped S.G.  Though it opened an investigation against her mother after S.G. was kidnapped, the case never went to court and the investigation was closed.

6613667v.1

ACS never met with S.G. and never allowed her to enter foster care.  S.G. is still angry that ACS ignored her when she was in need.

175.    Because the TIL staff was unable to get S.G. (then 17) into foster care through ACS, and because she could not stay at the TIL after her trafficker learned its location, S.G. was forced to enter the City's youth shelter system.  With the help of the TIL staff, S.G. secured a bed at a youth crisis shelter.  She stayed at the crisis shelter for 60 days.

176.    After her discharge from crisis shelter, S.G. was picked up on a Family Court warrant.  The judge ultimately dismissed the warrant and all matters in Family Court.  The Judge released S.G. back to the same TIL where she was not permitted to stay because her trafficker had learned its location.

177.    The TIL staff again called ACS, requesting that the agency open a case for S.G. and take her into its care.  ACS did nothing.  The TIL staff then reached out to another crisis shelter, which accepted S.G.  Because of her trafficking history, S.G. did not feel safe at the crisis shelter.

178.    S.G. soon returned to the original TIL placement, where the TIL staff agreed to allow her to stay until October 2012.  She left at that time with nowhere to go.

179.    S.G. and her partner (the eventual father of her twins) began sleeping on the streets of New York City.  They spent many nights on the 6 train, in a park in the Bronx, and occasionally on the floors and couches of friends.  S.G. was unhappy to be back on the street, but there were no City youth shelter options available for her.

180.    In the spring of 2013, S.G. learned that she was pregnant.  The original TIL program accepted her back for a third time, from approximately May to July 2013.  In the weeks following her final discharge from the TIL, S.G. and her partner slept in parks in the

6613667v.1

Bronx and on subway cars while she was several months pregnant.   S.G. felt horrible about being pregnant and homeless.  She vowed that she would not raise her children on the street.

181.    When S.G. turned 18, she and her partner moved into DHS family shelter.

182.    Since S.G. moved into the DHS shelter in August 2013, she has not received any help or support from DHS staff.  As a young pregnant woman, S.G. did not receive help with transportation to and from doctor's appointments.  Recently S.G.'s caseworker was required to submit paperwork to the Human Resource Administration ("HRA"), but she failed to do so.  As a result, S.G. was forced to take her infant twins to the HRA office in the snow to prevent her benefits from being suspended.  Her sons had not been immunized.

183.    The conditions of S.G.'s shelter apartment are unlivable for her family. She does not have a kitchen in her unit, which makes feeding her twins extremely difficult.  She also does not have access to basic childcare supplies.  Though S.G. was promised that she would be transferred into an apartment suitable for a family of four, she is still waiting for the transfer.

184.    S.G.'s DHS caseworker continually threatens S.G. with eviction from shelter and encourages her to move back into her mother's home, where she has not lived for over six years.

185.    S.G.'s primary goals are to care for her family and to locate long-term, stable housing.  S.G. believes that no one at her DHS shelter is helping her achieve this goal. She is motivated to help herself but is frustrated that she has to fight for assistance.

186.    S.G. has been diagnosed with depression.  She was hospitalized approximately five times between the ages 14 and 17.  For the past two years, S.G. has received mental health care from an adolescent health center.

6613667v.1

187.    Despite the traumas she has experienced, S.G. earned her GED, and she plans to attend college starting in fall 2014.  S.G. hopes to major in child development.

188.    S.G. wishes to remain anonymous in this lawsuit because she is afraid that, if her name becomes public, it will compromise her and her family's safety.  She does not want individuals from her past to be able to find her.

**Named Plaintiff E.L.**

189.    E.L. is 20 years old.  He is a man of transgender experience who identifies as white and Latino.  He currently stays at a youth shelter in Brooklyn, New York.

190.    E.L. has been homeless since he was 17.  Growing up, he lived in various places on the east coast of the United States and in Europe.  During his early adolescence, E.L.'s family moved to Virginia.  E.L. struggled during this time because his peers did not accept him. When E.L. was 16, his family moved to Plattsburg, New York.  E.L. attended a school there where he felt accepted by his teachers and other students.  Because of this acceptance, E.L. began transitioning to live as a male.

191.    Shortly after his transition began, E.L.'s parents learned of his gender identity.  They were not supportive.  Instead, they verbally and emotionally abused him — telling him that demons were following him, that he was acting out for attention, and that his change was the result of a horrible accident that he suffered during childhood.

192.    After treating him with anger and disgust for several months, E.L.'s parents kicked him out of their home.  They told him that he was no longer welcome because he was corrupting his younger siblings.  Though this rejection coincided with E.L.'s exams during his senior year of high school, E.L. was able to graduate with the support of his school.

193.    E.L. moved in with his grandparents in Virginia, but they also rejected him.  They refused him access to their computer.  They referred to him as "it," and said things like, "since you'll never be happy, why don't you just kill yourself."

194.    After six months, E.L. left his grandparents.  Though his grandparents had hidden his money, he managed to recover some and purchase a bus ticket to Albany, New York, where he knew of a shelter for homeless youth.

195.    The youth shelter in Albany provided E.L. with a crisis shelter bed and eventually admitted him to a TIL program.  E.L. stayed at the TIL for roughly 18 months.  He found a job and started working.  Once he could afford it, E.L. rented a room in his friend's house.

196.    E.L. had been stable for several months when his depression became severe.  He could not get out of bed, and he lost his job.  When he could not afford to pay rent, his landlord asked him to leave.

197.    E.L. had nowhere to go, so he stayed on friends' couches for a couple of weeks.  He contacted the crisis shelter where he stayed when he was 17, but he was told that he was no longer eligible because the program only serves youth under 18.  He also contacted his prior TIL program, which had a waiting list.

198.    At a friend's suggestion, E.L. stayed at a shelter in New Rochelle, New York for a couple of weeks.  The experience was unbearably difficult.  E.L. was initially placed on the men's side of the shelter, but the shelter staff moved him to the women's room when they discovered that he was a man of transgender experience.  Though he asked the shelter staff not to share his gender identity with other residents because he feared retaliation, a staff member announced E.L.'s gender identify in front of all of the shelter residents.

199.    E.L. only stayed at the New Rochelle shelter because he was trying to access a longer-term shelter in Valhalla, New York, which required both a referral from the Westchester Department of Social Services ("DSS") and proof that he had stayed in crisis shelter for two weeks.  E.L. asked DSS for assistance, but since his benefits were from Albany, DSS told him to return there.  E.L had nowhere to go in Albany and no way to get there, so he stayed in New Rochelle.

200.    E.L. subsequently learned of a shelter in Stamford, Connecticut that he thought would support his gender identity.  When he went to the shelter, the staff told him that they could not place him in the men's shelter because is a transgender man.  E.L. tried to go to the women's shelter, but was not admitted there, either.  Since it was late at night when E.L. was declined from the women's shelter, the shelter agreed to give him a bed for one night.

201.    The following day, the staff at the Stamford men's shelter called a church shelter in New York City for LGBT youth.  After learning that there was space available, E.L. took a train to New York City.

202.    E.L. stayed at the church shelter for about two and a half weeks.  He left the shelter when he heard about another youth shelter with longer stays and better resources.

203.    After five days on the waiting list, E.L. obtained a bed at the City youth crisis shelter.  He is currently staying at this shelter.

204.    E.L. feels supported in his current shelter, but he is worried that he will be discharged in January 2014.  He is hoping for an extension, which will let him stay longer.  E.L. does not know where he will sleep if he is discharged from shelter.

205.    Staff at the crisis shelter have spoken to E.L. about applying for a TIL program.  But E.L. does not qualify for a TIL program because he is not enrolled in school, nor

does he have a full-time job.  E.L. fears he will not be able to obtain a job while in crisis shelter because his depression and anxiety disorders inhibit his daily activities.

206.    E.L. would like to apply for SSI based on his mental health diagnoses, but no one has assisted him with this process.  E.L. believes that he cannot complete the SSI application process because it is too challenging for him.

207.    E.L. was diagnosed with depression when he was 17, before his parents ejected him from their home.  He was suicidal and hospitalized once after a school administrator grew concerned at his level of depression.  He was discharged from the hospital on the condition that his parents enroll him in therapy.  They did not.  When E.L. was staying with his grandparents, his parents found a therapist to meet with him over the phone.  They discontinued their meetings, however, because the therapist had no experience with people of transgender experience.  E.L. wanted a therapist who had this type of experience, but his father would not let him speak to one.

208.    Later, while staying at the youth shelter in Albany, E.L. received additional diagnoses of PTSD and anxiety disorders.  He has taken Prozac in the past, including when he came to New York City, but his prescription has expired.

209.    E.L. has struggled to access mental health care since arriving in New York City.  He is a Medicaid recipient, but his plan is a managed care program from Albany.  He does not know where to begin to find a doctor who will accept his insurance in New York City.

210.    E.L. did not have access to health care at the church shelter, so E.L. asked to see a psychiatrist as soon as he arrived at his current shelter.  He was not permitted to see the psychiatrist directly.  He was told he needed a referral from the shelter's general doctor.

40

211.    It took about four weeks before E.L. was able to get a referral and meet with the shelter's psychiatrist, who prescribed medication to help E.L. with his depression and anxiety.  E.L. hopes that his current shelter will help him transfer his Medicaid plan to New York City, but he does not know when that will happen.

212.    E.L.'s depression, PTSD, and anxiety affect his ability to work and manage his life independently.  At times, E.L. cannot get out of bed.  His symptoms worsen in the winter.

213.    E.L. wants to live on his own and feel well enough to work.  He hopes to work as an activist for young people.  To achieve this goal, E.L. would like to access supportive housing because he believes the assistance there will help to stabilize him.  However, the staff at E.L.'s shelter told him that his diagnoses may not be severe enough for him to qualify for a supportive housing placement.

214.    If E.L. cannot get into a TIL program or receive a supportive housing placement, he does not know how he will be able to obtain longer-term housing.  He fears he will end up on the street again.

215.    E.L. wishes to remain anonymous in this litigation because he does not want his homelessness to be used against him.

**Named Plaintiff S.A.**

216.    S.A. is 20-year-old gay man from New Hyde Park, New York.  S.A. has been homeless since he was kicked out of his grandmother's home in May 2013.

217.    S.A. has been staying at a City youth crisis shelter since November 2013.  He does not know when he will be discharged, or where he will go if he is discharged.  He is in the process of applying for a TIL.

218.    S.A. became homeless after he told his father that he is gay.  At the time, S.A. had completed his first year of college and was living with his grandmother.  S.A.'s father refused to accept S.A.'s sexual orientation and alienated him from his grandmother.  When S.A. returned home after revealing his sexual orientation to his father, he found all of his belongings outside of his grandmother's house.  She refused to let him inside.  Without the support of his family, S.A. has not returned to college.

219.    After his grandmother kicked him out, S.A. spent several months sleeping on the couches of various friends.  He moved from one place to another regularly because he was not allowed to stay in any place for very long.

220.    S.A. was first admitted to a City youth crisis shelter in mid-August 2013. He stayed there for almost two months.  After he left, S.A. drifted in and out of the other youth shelters, but he never stayed very long because he did not feel welcome.  In between shelters, S.A. stayed with friends or slept on subway trains.

221.    S.A. once attempted to enter the adult shelter system.  He went to the men's intake location at 30th Street in Manhattan, but before entering the building he decided he did not want to stay there.  S.A. thought the shelter looked like a jail.  Based partly on this experience, S.A. never wants to stay at an adult shelter.

222.    Another night, S.A. slept at a drop-in center for homeless adults.  He slept in an uncomfortable chair, next to someone who was extremely intoxicated.   S.A. did not shower there because he saw vomit and spit in the toilet and the shower, as well as urine on the toilet and the floor.  Despite feeling uncomfortable and unsafe, S.A. had nowhere to sleep so he returned to the drop-in center the next night.  He was turned away and told that he was only allowed to stay there one night.

6613667v.1

223.    Two days later, S.A. returned to the drop-in center with staff from a youth street outreach team to help him.  The staff at the adult drop-in center still refused to let him in, even though they had plenty of room.  The drop-in center staff said that they could not admit S.A. because he was not on their list of referred clients.

224.    S.A. enrolled in emergency medical technician ("EMT") school after receiving a flyer from staff at the youth crisis shelter where he stayed from August to October 2013.  Because he was sleeping on the street when EMT classes began, S.A. had to bring all of his belongings to school for the first two weeks.  As a result, S.A.'s teacher figured out that he was homeless, which deeply upset him.  S.A. does not want the other students to find out that he is homeless because he would feel embarrassed or targeted.

225.    S.A. hopes to pass the EMT certification test and find a job as an EMT once he finishes the four-month training program.  In the interim, and in addition to attending school two days a week, S.A. has a part-time job in construction three days a week.

226.    When S.A. was about six, he was diagnosed with ADHD and Attention Deficit Disorder ("ADD").  He was prescribed Adderall from first grade through third grade.  S.A. was in a special education program and had an Individualized Education Plan ("IEP").  S.A. had trouble learning English after coming to the United States from Europe as a small child, and he could not speak English clearly until fourth grade.  S.A. still has some trouble pronouncing certain words in English.

227.    Even before S.A. became homeless, his life was not stable.  S.A. was born in Eastern Europe and adopted by his parents.  Throughout his childhood, S.A. moved frequently because his father's job required the family to relocate.  Social services agencies have been involved in his life for as long as S.A. can remember.  When S.A. was in fourth grade, he and his

brother were almost taken into foster care.  When S.A. was 14, his mother abandoned him and his brother in an airport in Florida.

228.    Being homeless is hard for S.A.  There is never enough food at the shelter, and S.A. frequently feels like he is starving.  In addition, though Metrocards are available to shelter residents, they are only provided by a supervisor, and S.A. leaves for work before the supervisor arrives each morning.  Being homeless has also made it difficult for S.A. to obtain his birth certificate, which he worries will affect his ability to obtain employment as an EMT and get his life on track.

229.    S.A. wishes to remain anonymous in this lawsuit because he does not want the private facts of his life to be publicly disclosed.

**Named Plaintiff F.E.**

230.    F.E. is a 19-year-old mixed-race, queer woman who grew up in Brooklyn, New York.  She has been homeless for about 14 months.

231.    F.E. has been staying at a TIL in Manhattan since May 2013.  The TIL staff told her that she can stay for 18 months.  She does not know where she will go after she is discharged.

232.    Before becoming homeless, F.E. lived with her mother.  Because her mother does not accept her sexual identity, their relationship has been strained for a long time.  F.E.'s mother forced her to leave their home several times in the last few years, occasionally sending her to stay with a relative.  Once, F.E.'s uncle assaulted her while she was staying with her grandmother.

233.    In October 2012, F.E.'s mother found her necklace in F.E.'s room and accused F.E. of stealing.  They got into a physical fight.  F.E.'s mother took F.E.'s house keys and told her to leave.

234.    After her mother kicked her out, F.E. went with her girlfriend and her girlfriend's one-year-old daughter to F.E.'s grandmother's house in Brooklyn.  They stayed there during Hurricane Sandy, but once subway service resumed after the storm, F.E.'s uncle kicked them out.

235.    That night, F.E. and her girlfriend slept on the subway with her girlfriend's daughter.  It was very cold, and they had only one coat between them.

236.    Another night, F.E., her girlfriend, and her girlfriend's daughter slept in the hallway outside of a friend's apartment, but they had to leave at 5:00 a.m. because their friend did not want his mother to find out they were staying there.

237.    F.E. and her girlfriend tried to enter roughly four different shelters, but were turned away at all of them.  One DHS staff member told them that they could be reported to ACS because the baby was sleeping in the cold, but no shelter would accept them.

238.    The police told F.E. and her girlfriend to go to a DHS family shelter, but they had no money for transportation or food.  The police gave them food and milk for the baby. F.E. was initially nervous about the police talking to her, and she was so surprised and grateful when they helped her that F.E. felt like she wanted to cry.

239.    The next day, F.E. and her girlfriend went to intake for a DHS family shelter, but DHS would not admit them because they were not domestic partners.  About four days after they were kicked out of F.E.'s grandmother's house, they went to Georgia.

240.     F.E. stayed in Georgia for about two and a half months.  F.E.'s mother did not know where she was during that time, but F.E. called her mother at her girlfriend's insistence.  Over time, F.E. talked to her mother more often, and F.E.'s mother urged her to come back to New York.

241.     Even though F.E.'s mother had convinced her to return to New York, she made clear after F.E. returned that F.E. could not stay with her.

242.     F.E. tried to sleep at a City youth crisis shelter, but she was placed on a waiting list.  During her three-week wait for a crisis bed, F.E. went back and forth between her mother's and grandmother's houses.  F.E.'s mother told her she did not want her to go to a shelter, but she would not let F.E. live with her.

243.     F.E. entered a City youth crisis shelter at the end of January 2013.  In mid-March, she was discharged from the shelter because of a dispute with another resident.

244.     Extremely upset about her discharge, F.E. tried to commit suicide.  She swallowed multiple antidepressant pills at once.  She went to the emergency room, where she was treated for the overdose and admitted to the psychiatric ward for about a week.

245.     While hospitalized, F.E. was given Risperdal and a medication to help her sleep.  The hospital discharged F.E. to her grandmother's house, with instructions to see her treating psychiatrist.

246.     Before F.E. was discharged from the crisis shelter, she was accepted to a TIL.  She was put on a waiting list because not enough beds were available.  About two and a half months later, F.E. received notice that the TIL had an available bed.  She moved into the TIL, where she is currently staying.

6613667v.1

247.    F.E. has been diagnosed with major depression, and she believes she may also have a diagnosis of PTSD.

248.    The psychiatrist at the youth crisis shelter prescribed Risperdal for F.E., but it caused her to have suicidal thoughts.  The psychiatrist gave her another medication, but it caused unbearable physical side effects.

249.    F.E. is now working on an application for supportive housing.

250.    F.E. graduated from high school, and she is now in college. She does not know whether she will continue to attend college because it is difficult for her to manage school and counseling while living in a shelter.  F.E. cannot reduce her course load because she is not eligible for financial aid unless she takes a full course load.

251.    F.E. is debilitated by uncertainty regarding whether she can remain at the TIL for a full 18 months, and what she will do next.  Sometimes it is a struggle for F.E. simply to get out of bed each morning.

252.    F.E. wishes to remain anonymous in this lawsuit.  She does not want her status as a homeless youth to follow her throughout her life.

**Named Plaintiff D.G.**

253.    D.G. is a 17-year-old bi-racial black, transgender male who grew up in Suffolk County and the Bronx, New York.  D.G. has been homeless since around February 2012.

254.    D.G. is currently staying at a City youth crisis shelter.  The City offered him this shelter placement only after receiving a December 2, 2013 demand letter from Plaintiffs' attorneys threatening this litigation.

255.    Since D.G. left home, he has split his time between the New York City streets and the City youth shelter system.

256.    D.G. has not lived with his family since he was 13.  He does not get along with his mother, and he has never had a relationship with his father.

257.    D.G. initially left home to live at a therapeutic residential facility operated by an organization that assists homeless New Yorkers.  Since leaving there, he has lived all over New York City and Long Island.  He stayed in Long Island for a few months, and with a friend in Brooklyn for few months.   After that, he started sleeping on the City streets.

258.    In 2013, D.G learned about youth drop-in centers and crisis shelters.  He tries to utilize these services despite being too young to qualify for almost all programs.  D.G. has also learned to use drop-in centers intended for adults as well as one program operated out of a church.

259.    During the colder months, when he is not able to stay at a City youth shelter or with friends, D.G. rides the subways and ferries of New York City's public transportation system.  D.G. prefers the 1 and E trains because he is usually left alone by other riders and the police.  D.G. has also slept on the A train, in the Port Authority and Staten Island Ferry terminals, and on the Staten Island ferry.  He has slept on various piers along Manhattan's waterfront, in New York City parks, in building staircases, on the steps of churches, on Christopher Street, and in various fast-food restaurants.  Because he does not feel safe sleeping while riding the subways and ferries, he often goes for days without sleep.

260.    D.G. often must lie about his age to access homeless services in the City. D.G. believes he has to lie because each time he gives his correct age, he either cannot access services at all, or the provider calls ACS, which tries to send him back to Suffolk County.  Lying about his age often allows him to get a few nights of safety and sleep.

261.     D.G. regularly speaks with Suffolk County Child Protective Services ("CPS") and a detective from Suffolk County, who contacts him when ACS is notified of his presence at a City youth crisis shelter.  Once the shelter contacts ACS, ACS contacts CPS, which in turn contacts D.G.'s family and the police.  D.G. has repeatedly told the detective and Suffolk County child protective services staff that he will not go back to Suffolk County, and they eventually close each investigation.

262.     The staff at the youth shelter where D.G. recently stayed has recommended that D.G. undergo a mental health evaluation since he has been experiencing frequent anxiety attacks.  He believes that he may qualify for SSI because he has been diagnosed with ADHD and bipolar disorder in the past.

263.     D.G. has attempted suicide and has regularly cut and burned himself. D.G. has taken many different types of medication to treat his mental health conditions, but he does not like their side effects.  He would consider taking medication if he could see a doctor regularly.

264.     D.G. also suffers from physical ailments that at times prevent him from seeking services and shelter.  D.G. suffers from recurring back spasms, anemia, and asthma. When these conditions arise, D.G. is not able to consistently access the medical care or medication he needs, which in turns prevents him from participating in various supportive services.

265.     Accessing medical services can be difficult because D.G. is often discriminated against by hospital providers.  For example, when D.G. was treated at a particular hospital in September 2013, the nursing staff refused to refer to him as male until he spoke to a

supervisor.  D.G. does not like obtaining medical care as a transgender man because he does not see the same provider consistently, and he often has to fight to be called "he."

266.    D.G. has experienced a substantial amount of trauma.  He suffered sexual and physical assaults while living in Suffolk County.  Many of these assaults were carried out by individuals in his community, including at his school, which partly explains why he does not feel safe living on Long Island.

267.    Living on the City streets, D.G. has been robbed many times.  He has lost clothing, belongings, documents, and other essentials.  D.G. believes that his years as a homeless youth have exacerbated his physical and mental health issues.

268.    When D.G. attended school, he was in a special education program.  He has an IEP.  D.G. is currently registered at a high school in the Bronx, but he no longer feels safe there since he was attacked by another student in October 2013.  As a result of the fight, D.G. sustained a black eye and bruising to his nose and face.  D.G. finds it hard to attend school consistently when he does not have stable housing or transportation.

269.    Due to D.G.'s age, he does not qualify for various services or housing programs available to older homeless youth, but he also does not qualify for the services available to New York City adolescents in foster care since he is from Suffolk County.  As a result, he feels the easiest path to housing is to find a job, save money, and try to rent a room.

270.    D.G. wishes to remain anonymous in this litigation.  He does not feel comfortable publicly sharing his name and story.

## FACTUAL ALLEGATIONS ABOUT THE PROPOSED CLASS

271.    Named Plaintiffs bring this action, pursuant to Fed. R. Civ. P. 23(a), (b)(1), and (b)(2), on behalf of themselves and as representatives of a class of all current and

6613667v.1

future homeless youth ages 16 to 20 who have sought or will seek youth shelter and services, yet have been denied or are at imminent risk of being denied such shelter and services by the City.

272.     The proposed class is so numerous that joinder of all class members in this action would be impracticable.  There are thousands of individuals in this class.  According to one survey, over 3,800 young people are homeless in New York City on any given night.[42]

273.     In addition, joinder is impracticable because the class is transitory and many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.  There is no appropriate avenue for the protection of the class members' constitutional and statutory rights other than a class action.

274.     The claims of the Named Plaintiffs are typical of the claims of the class, and there are common questions of law and fact.  Common questions of law and fact include, but are not limited to:

(i)      whether the City denies youth shelter to homeless youth ages 16 to 20;

(ii)     whether the City's denial of youth shelter to homeless youth ages 16 to 20 deprives them of a property interest without due process of law;

(iii)    whether the City denies shelter to homeless youth ages 16 to 17, while it provides shelter to homeless adults and homeless youth living with families;

(iv)     whether the City denies youth shelter to homeless youth ages 16 to 20 with disabilities; and

(v)      whether the City's denial of youth shelter to homeless youth ages 16 to 20 has a disparate impact on homeless youth with disabilities.

275.     The Named Plaintiffs will adequately and fairly protect the interests of all members of the proposed class because they have the requisite personal interest in the outcome of this litigation and have no interest adverse to any members of the proposed class.

---

[42] 2008 ESC Report.

276.    Like the other members of the class, the Named Plaintiffs have been and will be victims of the City's denial of youth shelter to homeless youth ages 16 to 20.  In addition, the legal theories under which the Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely.

277.    Counsel for the Named Plaintiffs will be able to provide adequate and appropriate representation to the class in this litigation.  The Legal Aid Society is experienced in complex class action litigation, including on behalf of homeless adults and homeless families in New York City.  Patterson Belknap Webb & Tyler LLP is also experienced in complex class action litigation, including litigation on behalf of vulnerable youth.

278.    A class action is the superior method for a fair and efficient adjudication of this matter because the City has acted in a manner generally applicable to the entire class.  Moreover, a class action will avoid numerous separate actions by class members that would unduly burden the courts and create the possibility of inconsistent decisions, thereby making final injunctive and declaratory relief appropriate for the class as a whole.

279.    It would be impracticable for potential plaintiffs, who are by definition homeless youth, to obtain legal services on an individual basis for their claims.  Hence, their rights under the law may well be meaningless without certification of a class action seeking common redress.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983
Against the City for Violations of the Equal Protection Clause of the
Fourteenth Amendment to the U.S. Constitution**

280.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 279 as if set forth in their entirety here.

281.    The Fourteenth Amendment of the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

282.    The City's denial of shelter to homeless youth ages 16 to 17 violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

283.    In New York City, homeless men, homeless women, and homeless families have a right to shelter and are provided such shelter pursuant to court order.  *Callahan v. Carey*, Final Judgment on Consent, Index No. 42582/79 (Sup. Ct., N.Y. County Aug. 26, 1981) (mandating shelter for homeless men); *Eldredge v. Koch*, 98 A.D.2d 675, 676 (N.Y. App. Div., 1st Dep't 1983) (extending right to women on equal protection grounds); *McCain v. Koch*, 217 A.D.2d 198, 211-216 (N.Y. App. Div., 1st Dep't 1986) (extending right in a preliminary injunction to families on, *inter alia*, equal protection grounds); *Ebony Boston v. City of New York,* Final Judgment on Consent, Index No. 402255 (Sup. Ct. N.Y. County Dec.12, 2008) (extending right to families in a final judgment).

284.    The City's policy and practice of not providing shelter to homeless youth ages 16 to 17, while providing such shelter to homeless adults and families, constitutes an impermissible government classification that denies these youth equal protection of the laws.

285.    By providing shelter to adult men and women but not homeless youth ages 16 to 17, the City imposes an age-based classification that lacks a rational basis.

286.    In addition, by providing shelter to homeless families but not homeless youth ages 16 to 17 without families, the City imposes a family status-based classification that is not substantially related to permissible state interests and lacks a rational basis.

287.     Plaintiffs have suffered harm by the City's violation of their rights under the Fourteenth Amendment.  These harms include but are not limited to rape, physical assault, robbery, sex trafficking, extreme emotional trauma, and sexually transmitted diseases, including HIV/AIDS.

288.      By its acts and omissions, the City has acted under color of state law to deprive Plaintiffs of their rights to equal protection of the law under the Fourteenth Amendment of the United States Constitution, and it is therefore liable under 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
**Claims of Named Plaintiffs and Class Members Against the City for Violations of the New York Runaway and Homeless Youth Act**

289.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 279 as if set forth in their entirety here.

290.     The NY RHYA confers a right to shelter to homeless youth ages 16 to 20.

291.     The NY RHYA provides that an "approved runaway program is authorized to and *shall* provide assistance to *any* runaway and homeless youth . . . including but not limited to food, shelter, clothing, medical care, education and individual and family counseling."  N.Y. Exec. Law. §§ 532-b(1)(a), 532-b(1)(e) (emphases added).

292.     In addition, the NY RHYA provides that "residential facilities operating as transitional independent living support services are authorized to and *shall*: (a) *provide shelter* to homeless youth between the ages of sixteen and twenty-one as defined in this article."  N.Y. Exec. Law. § 532-d.

293.     The NY RHYA defines a "homeless youth" as a "person under the age of twenty-one who is in need of services and is without a place of shelter where supervision and care are available."  The NY RHYA defines "runaway youth" as a "person under the age of

eighteen years old who is absent from his legal residence without the consent of his parent, legal guardian, or custodian." N.Y. Exec. Law §§ 532-a(1)-(2).

294.    Class members under age 18 fall within the NY RHYA statutory definitions of runaway and homeless youth. Class members under age 21 fall within the NY RHYA statutory definition of homeless youth. *See* N.Y. Exec. Law. §§ 532-a(1)-(2).

295.    DYCD is a City agency responsible for overseeing the City youth shelter system, including crisis shelters and TILs. Under the New York City Charter, DYCD is the designated "county youth bureau" for the five boroughs of New York City. New York City Charter § 733. The City is therefore legally required to provide "any runaway and homeless youth" with shelter and services. N.Y. Exec. L. §§ 532-b(1)(a), 532-b(1)(e). Through their contractual obligations, the crisis and TIL shelter providers operate at DYCD's control and direction.

296.    Plaintiffs are runaway and homeless youth who are being deprived youth shelter and services by the City in violation of the NY RHYA.

297.    The City deprives Plaintiffs of youth shelter and services in violation of the NY RHYA every time the City denies a runaway or homeless youth access to crisis shelter or denies a homeless youth access to a TIL due to lack of beds or for any other reason not permitted by the NY RHYA.

298.    The City deprives Plaintiffs of youth shelter and services in violation of the NY RHYA every time the City ejects a runaway or homeless youth from shelter to the street.

299.    The City deprives Plaintiffs of shelter and services in violation of the NY RHYA every time the City ejects a homeless youth from crisis shelter after a 30- to 60-day stay.

6613667v.1

300.    Plaintiffs have suffered harm by the City's violation of their rights under the NY RHYA.  These harms include but are not limited to rape, physical assault, robbery, sex trafficking, extreme emotional trauma, and sexually transmitted diseases, including HIV/AIDS.

301.    Plaintiffs are members of the class the statute was enacted to benefit. Enforcement of the NY RHYA would promote the legislative purpose of the statute and is consistent with the legislative scheme.

302.    By its acts and omissions, the City has acted under color of state law to deprive the Named Plaintiffs and class members of their rights under the NY RHYA.

### THIRD CAUSE OF ACTION
**Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983
Against the City for Violations of the Due Process Clause of the
Fourteenth Amendment to the U.S. Constitution**

303.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 279 as if set forth in their entirety here.

304.    The Fourteenth Amendment of the United States Constitution provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

305.    The City's denial of shelter to runaway and homeless youth ages 16 to 20 violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

306.    Plaintiffs have a property interest in shelter under New York State law, including the NY RHYA, which the City has deprived Plaintiffs of without due process of law.

307.    The New York courts have interpreted New York State law to afford homeless individuals a right to shelter.  The NY RHYA provides that the DYCD shall provide shelter to any runaway and homeless youth ages 16 to 20.  Plaintiffs therefore have a property interest in shelter afforded by the laws of New York, including the NY RHYA.

6613667v.1

308.    The City deprives Plaintiffs of their property interest in youth shelter in violation of the Fourteenth Amendment in each instance where it denies homeless youth access to shelter without fair process, including notice and an opportunity to challenge the denial.

309.    The City deprives Plaintiffs of their property interest in youth shelter in violation of the Fourteenth Amendment in each instance where it ejects homeless youth from shelter without fair process, including notice and an opportunity to challenge the ejection.

310.    The City does not provide any procedure by which youth ages 16 to 20 can challenge the City's denial of youth shelter or ejection from youth shelter to the street.

311.    Plaintiffs have suffered harm due to the City's violation of their rights under the Fourteenth Amendment.  These harms include but are not limited to rape, physical assault, robbery, sex trafficking, extreme emotional trauma, and sexually transmitted diseases, including HIV/AIDS.

312.    By its acts and omissions, the City has acted under color of state law to deprive Plaintiffs of their rights to procedural due process under the Due Process Clause of the Fourteenth Amendment, and it is therefore liable under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION
**Claims of Named Plaintiffs and Class Members Against the City for Violations of Title II of the Americans with Disabilities Act for Failure to Reasonably Accommodate Plaintiffs**

313.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 279 as if set forth in their entirety here.

314.    Title II of the ADA prohibits discriminating against individuals with disabilities in accessing public services:  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

6613667v.1

315.    The ADA further prohibits excluding qualified individuals with disabilities from participating in public services based on their disabilities:  "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

316.    The City is a public entity within the meaning of the ADA.  42 U.S.C. § 12131(1)(A).

317.    Many Plaintiffs are qualified individuals with mental health disabilities, including but not limited to depression, anxiety disorders, PTSD, and bipolar disorder.  42 U.S.C. § 12131(2).

318.    The NY RHYA provides that an "approved runaway program" "***shall*** provide assistance to ***any*** runaway and homeless youth . . . including but not limited to food, shelter, clothing, medical care, education and individual and family counseling."  N.Y. Exec. Law §§ 532-b(1)(a), 532-b(1)(e) (emphases added).   Shelter and these services are therefore nominally available to homeless youth.

319.    Many Plaintiffs' disabilities make it difficult for them to access youth shelter and services that are nominally available to homeless youth.  They have trouble obtaining shelter in youth crisis shelters and TILs and are often ejected from these programs.

320.    Accessing the City's youth shelters requires focus and commitment. Because there are so few beds available, homeless youth must persistently advocate for a place to sleep.  Youth with mental disabilities often do not have the skills necessary to obtain a bed in the

City's youth shelter system.  In addition, because of their disabilities, many homeless youth cannot travel around the City to access crisis shelters or services.

321.    Even if they are able to obtain crisis shelter, homeless youth with disabilities are effectively barred from TILs and other longer-term shelter options — either because they cannot navigate the application process, or because they are denied entry due to their disabilities.  Many homeless youth are ejected from shelter back to the street because their mental disabilities impede their ability to comply with program requirements.

322.    The City does not provide reasonable accommodations to Plaintiffs with disabilities to allow them to access shelter and services that are nominally available to homeless youth.

323.    Plaintiffs have suffered harm by the City's violation of their rights under the ADA.  These harms include but are not limited to rape, physical assault, robbery, sex trafficking, extreme emotional trauma, and sexually transmitted diseases, including HIV/AIDS.

324.    By its acts and omissions, the City has acted under color of state law to deprive the Plaintiffs of meaningful access to public benefits to which they are legally entitled under the ADA, and it is therefore liable under 42 U.S.C. § 1983.

**FIFTH CAUSE OF ACTION**
**Claims of Named Plaintiffs and Class Members Against the City for Violations of Title II of the Americans with Disabilities Act for Discriminatory Acts Against Plaintiffs**

325.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 279 as if set forth in their entirety here.

326.    Title II of the ADA prohibits discriminating against individuals with disabilities in accessing public services:  "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

327.    The ADA further prohibits excluding qualified individuals with disabilities from participating in public services based on their disabilities:  "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

328.    The City is a public entity within the meaning of the ADA.  42 U.S.C. § 12131(1)(A).

329.    Many Plaintiffs are qualified individuals with mental health disabilities, including but not limited to depression, anxiety disorders, PTSD, and bipolar disorder.  42 U.S.C. § 12131(2).

330.    The NY RHYA provides that an "approved runaway program" "**shall** provide assistance to *any* runaway and homeless youth . . . including but not limited to food, shelter, clothing, medical care, education and individual and family counseling."  N.Y. Exec. Law §§ 532-b(1)(a), 532-b(1)(e) (emphases added).   Shelter and these services are therefore nominally available to homeless youth.

331.    The City's denial of youth shelter to homeless youth ages 16 to 20 and its ejection of those youth from shelter to the street has a disparate impact on homeless youth with disabilities.

332.    When homeless youth with disabilities are denied access to crisis shelter, they are less equipped than homeless youth without disabilities to travel around the City seeking

6613667v.1

other youth shelter arrangements. Because there are so few beds available, homeless youth must persistently advocate for a place to sleep. Youth with mental disabilities are less likely to have the skills required for this task. They are more likely to end up on the street.

333.   In addition, homeless youth with disabilities are far less likely to gain entry to TILs and other long-term shelter beds because they cannot fulfill the application requirements. When they access TILs, they are more likely than homeless youth without disabilities to be ejected to the street because they often cannot consistently comply with TIL rules. Homeless youth with disabilities may not be able to stay in school or maintain steady employment — either of which is a requirement to apply to or remain in a TIL.

334.   Plaintiffs have suffered harm by the City's violation of their rights under the ADA. These harms include but are not limited to rape, physical assault, robbery, sex trafficking, extreme emotional trauma, and sexually transmitted diseases, including HIV/AIDS.

335.   By its acts and omissions, the City has acted under color of state law to deprive the Plaintiffs of meaningful access to public benefits to which they are legally entitled under the ADA, and it is therefore liable under 42 U.S.C. § 1983.

## SIXTH CAUSE OF ACTION
### Claims of Named Plaintiffs and Class Members Against the City for Violations of Section 504 of the Rehabilitation Act

336.   Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 279 and 313 through 335 as if set forth in their entirety here.

337.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), states:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

61

338.   The City receives federal financial assistance for its homeless youth programs.  *See* 29 U.S.C. § 794(a).

339.   Many Plaintiffs are qualified individuals with mental health and other disabilities that substantially limit one or more major life activities.  Such Plaintiffs have been diagnosed with mental health or other disabilities, or have not had the opportunity to be evaluated by a mental health professional.

340.   Many class members have been denied or effectively denied access to shelter or have been ejected from shelter to the street because of their disabilities.

341.   Plaintiffs have suffered harm by the City's violation of their rights under the Rehabilitation Act.  These harms include but are not limited to rape, physical assault, robbery, sex trafficking, extreme emotional trauma, and sexually transmitted diseases, including HIV/AIDS.

342.   By its acts and omissions, the City has acted under color of state law to deprive the Plaintiffs of meaningful access to public benefits to which they are legally entitled under the Rehabilitation Act, and it is therefore liable under 42 U.S.C. § 1983.

## SEVENTH CAUSE OF ACTION
### Claims of Named Plaintiffs and Class Members Against the City for Violations of the City Human Rights Law

343.   Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 279 and 313 through 342 as if set forth in their entirety here.

344.   New York City Administrative Code § 8-107(4)(a) provides that it "shall be an unlawful discriminatory practice for any person, being the . . . provider of public accommodation because of the actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship

6613667v.1

status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges."

345.    The City is a "provider of public accommodation."  New York City Administrative Code § 8-102(9).

346.    Plaintiffs include persons with mental disabilities, including but not limited to depression, anxiety disorders, PTSD, and bipolar disorder.  New York City Administrative Code § 8-102(16).

347.    Plaintiffs have suffered harm by the City's violation of their rights under the City Human Rights Law.  These harms include but are not limited to rape, physical assault, robbery, sex trafficking, extreme emotional trauma, and sexually transmitted diseases, including HIV/AIDS.

348.    By denying homeless youth with disabilities access to shelter and ejecting them from shelter into homelessness, the City has engaged in an unlawful discriminatory practice under New York Administrative Code § 8-107(4)(a).

## PRAYER FOR RELIEF

FOR ALL OF THESE REASONS, Plaintiffs respectfully ask this Court to order the following injunctive and/or declaratory relief:

1.    Enter a permanent order requiring the City, through its agency DYCD, to provide youth shelter and services to any homeless youth ages 16 to 20 who seeks them;

2.    Enter a permanent order prohibiting the City from denying youth shelter or services to any homeless youth ages 16 to 20 or ejecting such youth from shelter without fair process, including notice and an opportunity to be heard;

6613667v.1

3.      Enter a permanent order prohibiting the City from denying youth shelter or services to any youth ages 16 to 17 or ejecting such youth from shelter on the grounds that the City has classified the youth as a "runaway youth" without fair process, including notice and an opportunity to be heard;

4.      Enter a permanent order requiring the City to provide crisis shelter for all individuals properly classified as "runaway youth" in accordance with the NY RHYA, and prohibiting the City from ejecting runaway youth to the street at the end of that period;

5.      Enter a permanent order prohibiting the City from denying shelter or services to any homeless youth that it provides to homeless adults and homeless families;

6.      Enter a permanent order requiring the City to maintain a sufficient number of crisis shelter beds to satisfy the needs of homeless youth;

7.      Enter a permanent order requiring the City to maintain a sufficient number of TIL beds or other long-term shelter beds to satisfy the needs of homeless youth;

8.      Enter a permanent order requiring the City to provide reasonable accommodations to homeless youth with disabilities to allow them to access youth shelter and services;

9.      Enter an award of Plaintiffs' attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the Rehabilitation Act, the ADA, and the City Human Rights Law; and

10.      Grant such other and further relief as the Court deems equitable and just.

December 30, 2013
New York, New York

By: _Kimberly Forte_____
    Steven Banks
    Judith Goldiner
    Kimberly Forte
    Lisa Freeman
    Theresa Moser
    Beth Hofmeister
    LEGAL AID SOCIETY
    199 Water Street
    New York, NY 10038
    (212) 577-3300

    Attorneys for C.W.; D.S.; M.C.;
    A.H.; S.G.; E.L.; S.A.; F.E.;
    and D.G., by his next friend
    THEO LIEBMANN; and other
    similarly situated homeless
    youth

By: _Lisa E. Cleary_____
    Lisa E. Cleary
    Jason S. Gould
    Muhammad U. Faridi
    Catherine Geddes
    Jane Metcalf
    Alanna Small
    PATTERSON BELKNAP
    WEBB & TYLER LLP
    1133 Avenue of the Americas
    New York, New York 10036
    (212) 336-2000

    Attorneys for C.W.; D.S.; M.C.;
    A.H.; S.G.; E.L.; S.A.; F.E.; and
    D.G., by his next friend THEO
    LIEBMANN; and other
    similarly situated homeless
    youth

6613667v.1