```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
C.W.; D.S.; M.C.; A.H.; S.G.; E.L.; S.A.; F.E.;
I.F.; G.B.; and D.G., by his next friend, THEO
LIEBMANN; and other similarly situated youth,

                                        Plaintiffs,         13-CV-7376 (SJ)(VVP)

            v.                                              MEMORANDUM
                                                            AND ORDER
THE CITY OF NEW YORK,

                                        Defendant.
-----------------------------------------------------------------x
```

APPEARANCES:

THE LEGAL AID SOCIETY
199 Water Street
New York, New York 10038
By:    Judith Goldiner, Kimberly Forte, Lisa Freeman,
       Theresa B. Moser and Beth Hofmeister
*Attorneys for Plaintiffs*

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
By:    Lisa E. Cleary, Jason S. Gould, Muhammad U. Faridi,
       Catherine Geddes, Jane Metcalf and Alanna Small
*Attorneys for Plaintiffs*

ZACHARY W. CARTER
Corporation Counsel of the City of New York
100 Church Street, Room 2-164
New York, New York 10007
By:    Eric B. Porter, Assistant Corporation Counsel
*Attorneys for Defendant*

**JOHNSON**, Senior District Judge:

Plaintiffs, all but one of whom were 17- or 18-year-old homeless youths at the time this action was commenced, bring this class action against defendant City of New York ("Defendant" or "City"), alleging that the City violated their rights under federal law, the New York City Human Rights Law, and a state statute—the Runaway and Homeless Youth Act of 1978, N.Y. Exec. Law § 532 *et seq.* (the "RHYA")—by failing to provide, or ejecting them from, youth shelters. Defendant now moves for partial summary judgment, arguing that the RHYA does not obligate the City to provide youth-specific shelter to any 18- to 20-year-old homeless youth who seeks it. For the reasons stated below, Defendant's motion for partial summary judgment is granted and Plaintiffs' RHYA claim is dismissed with respect to all plaintiffs who were age 18 or older at the time this action was commenced.

## BACKGROUND

This is a civil rights action commenced by homeless individuals, aged 17 to 20, who, at some juncture, have been denied access to a youth shelter and/or ejected from such a shelter. The Amended Complaint alleges that "[b]y denying youth shelter to homeless youth ages 16 to 20 and ejecting them from shelter to the street without fair process," the City has violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution, the RHYA, the

Americans with Disabilities Act, the Rehabilitation Act of 1973, and the New York City Human Rights Law. Amended Complaint, ¶ 16. Plaintiffs principally seek injunctive relief, including an order requiring the City to provide youth shelter and services to any homeless youth aged 16 to 20 who seeks them and prohibiting the City from denying youth shelter or services to any homeless youth aged 16 to 20 or ejecting such youth from a shelter without fair process, including notice and an opportunity to be heard.

The instant motion pertains solely to Plaintiffs' claim that the City has violated the RHYA. According to the Amended Complaint, the RHYA "envisions a straightforward system in which homeless youth have unfettered access to youth shelter and services." Amended Complaint, ¶ 31. The pleading alleges that section 532-b of the New York Executive Law entitles "any homeless youth" to "crisis shelter, which includes a bed and services such as food, clothing, medical care, education, and counseling." *Id.* The pleading further alleges that sections 532-a and 532-d provide that homeless youth who cannot find alternative living arrangements during their stay at the crisis shelter "will move into transactional independent living programs (TILs)," from which they "will transition to independent living." *Id.*

The Amended Complaint also alleges that the RHYA "does not permit the City to discharge runaway or homeless youth from shelter back to the street under

any circumstance." *Id.*, ¶ 38. With respect to runaway youth, the pleading implies that N.Y. Exec. Law § 532-b "requires reunification with family, foster care placement, or housing according to any other suitable plan upon discharge from crisis shelter." *Id.* With respect to homeless youth, the pleading alleges that sections 532-a and 532-d permit them "to remain in crisis shelter until they secure a bed in a [transactional independent living] program or find suitable shelter elsewhere." *Id.*

**The Instant Motion**

Defendant now moves for partial summary judgment, arguing that the RHYA and related regulations "do not mandate the creation of youth-specific shelters, or impose any obligations on municipalities ...." Memorandum of Law in Support of Defendant's Motion for Partial Summary Judgment ("Defendant's Memo"), p. 1. In particular, Defendant urges the Court to reject Plaintiffs' claim that the RHYA obligates the City to provide youth-specific shelter to 18- to 20-year-old homeless youth, noting that the City already provides "generalized shelter" to these individuals. The motion expressly declines to address the issue of whether 16- to 17-year-old runaway and homeless youth are entitled to youth-specific shelter, noting that the City's "current policy, formalized following the initiation of this action, requires that youth-specific shelter programs receiving City funding must provide a shelter bed to any 16 or 17 year-old homeless or runaway youth who

seeks one" or "refer the youth to another youth-specific program with an available bed." *Id.*, p. 3, n. 4.

Defendant principally argues that "Plaintiffs' interpretation of the RHYA and Regulations is clearly at odds with their plain language ...." Defendant's Memo, p. 7. Defendant notes that N.Y. Exec. Law § 532-b imposes certain duties on "approved runaway programs," not on the City or any other municipality. Defendant's Memo, p. 8. Defendant contends that, in New York City, approved runaway programs are operated exclusively by "private not-for-profit entit[ies]," approved by the New York State Office of Children and Family Services (the "OCFS"). *Id.*, p. 9. According to Defendant, section "532-b merely dictates how [an] individual youth-specific shelter program must operate once ... certified by OCFS." *Id.*

Defendant concedes that subsection 2 of section 420 of the New York Executive Law, which was enacted at the same time as the RHYA, requires all municipalities to develop a "comprehensive plan to offer youth development programs," and requires those municipalities that seek partial reimbursement for services to runaway and homeless youth to include a "runaway and homeless youth plan" as part of that comprehensive plan. *Id.*, p. 15. However, Defendant maintains that these provisions "merely set[ ] up a framework within which a municipality, in order to obtain partial reimbursement from the State of the funds it

5

chooses to provide to runaway and homeless youth programs, must provide to OCFS a plan describing how such funds were or will be used to provide services to such youth." *Id.*, p. 17. Defendant argues that these provisions do not require a municipality, as a condition of receiving state reimbursement, to "establish and fund an expansive and infinitely expandable system of youth-specific shelters sufficient to meet whatever level of demand for such shelters arises among 18 to 20 year-olds at any time." *Id.*

In their Brief in Opposition to the City's Motion for Partial Summary Judgment ("Plaintiffs' Opposition"), Plaintiffs contend that § 420 creates an "opt-in framework" under which municipalities that agree to accept state funds "must adhere to the statute's mandate to supply shelter and services to satisfy need." Plaintiffs' Opposition, pp. 10-11. Plaintiffs do not point to a statutory provision creating this "mandate," but reason that "[i]t would be irrational for the Legislature to set forth, in careful detail, a remedial framework intended to address the needs of runaway and homeless youth, only to allow participating municipalities to shirk their responsibility to supply adequate shelter to meet that need." *Id.*, p. 11. Plaintiffs point to other statutes—such as the Individuals with Disabilities Education Act ("IDEA") and the Social Security Act ("SSA")—which require a state that opts to accept federal funding to provide certain benefits to all eligible beneficiaries. *Id.*, p. 12. Plaintiffs assert that the provisions relating to "approved

6

runaway programs" serve to "permit[ ] the City to delegate the operation of youth shelters, but not the obligations." *Id.*, p. 14 (emphasis omitted).

Plaintiffs' Opposition contends that the legislative history of the RHYA supports the view that the statute "imposes an obligation to provide youth shelter." *Id.*, p. 9. Plaintiffs quote from the Bill Memorandum authored by Assemblyman Lasher, the lead sponsor of the legislation, which stated: "This legislation will provide a broad basis for each county in the State to determine the particular nature of its own runaway and homeless youth problem and receive State aid to meet it." *Id.*, p. 8. Plaintiffs reason that this statement—coupled with the Governor's observation that "approved runaway programs" have the "duty to ... help arrange for the furnishing of necessary services"—mandates the conclusion that the City, having accepted State aid, is required "to rectify youth homelessness in the City based on need." *Id.*

## DISCUSSION

### A. Summary Judgment Standard

A party moving for summary judgment has the burden of establishing that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In considering a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to

assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (citing *Anderson*, 477 U.S. at 248). If the Court recognizes any material issues of fact, summary judgment is improper, and the motion must be denied. *See Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985).

In this case, there are no genuine issues of material fact. The question of whether Defendant is entitled to partial summary judgment upon the undisputed facts turns on a question of statutory construction. Plaintiffs interpret the RHYA as mandating that a municipality which elects to submit to the OCFS a plan for providing services to runaway and homeless youth also provide youth-specific services to any 18- to 20-year-old homeless individual who seeks those services. In moving for partial summary judgment, Defendant argues that the RHYA cannot reasonably be read as imposing these obligations on such a municipality.

**B. The Principles of Statutory Construction**

With any question of statutory construction, a court must first examine "the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 512 (2d Cir. 2017) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012)). The plain

8

meaning "does not turn solely on dictionary definitions of [the statute's] component words," but is also determined by "the specific context in which that language is used, and the broader context of the statute as a whole." *Yates v. United States*, ––– U.S. –––, 135 S.Ct. 1074, 1081-82, 191 L.Ed.2d 64 (2015) (plurality opinion) (internal quotation marks omitted). "[T]he Supreme Court and Second Circuit Court of Appeals have held that a term's meaning may be discerned by 'looking to the statutory scheme as a whole and placing the particular provision within the context of that statute.'" *Kane ex rel. U.S. v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 385 (S.D.N.Y. 2015) (quoting *Nwozuzu v. Holder*, 726 F.3d 323, 327 (2d Cir. 2013)).

"If the meaning is plain, the inquiry ends there." *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) (quoting *Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 423 (2d Cir. 2005)). If the court finds the statutory provision ambiguous, it may "then turn to canons of statutory construction for assistance in interpreting the statute." *Id.* (quoting *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015)). The court may "resort to legislative history only if, after consulting canons of statutory [construction], the meaning remains ambiguous." *Id.* (citing *Daniel*, 428 F.3d at 423); *see United States v. Peterson*, 394 F.3d 98, 105 (2d Cir. 2005) ("even if the statute were ambiguous, we would look to traditional canons of statutory construction to resolve the ambiguity, before

looking to legislative history and interpretive regulations."). "[I]f the canons of statutory interpretation and resort to other interpretive aids (like legislative history) do not resolve the issue," courts "give deference to the view of the agency tasked with administering the statute, particularly insofar as those views are expressed in rules and regulations that implement the statute." *Nat. Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001).

### C. The Statutory Scheme at Issue

The RHYA is part of a broader legislative scheme which was enacted in August 1978. *See* 1978 N.Y. Laws, ch. 722. The RHYA itself is codified as Article 19-H of the New York Executive Law and originally consisted of five statutory provisions. However, the legislation which created the RHYA also added a subsection entitled "Runaway and homeless youth plan; state aid" to Executive Law § 420, which is codified as subsection 2.

The central provision of the RHYA is Executive Law § 532-b, which, as originally enacted and at the time this action was commenced, authorized the creation of "approved runaway programs" and set forth the programs' duties to provide services to "runaway youth" and "homeless youth." The terms "runaway youth," "homeless youth," and "approved runaway program" are defined in § 532-a. At the start of 2018, § 532-b was amended by substituting the term "runaway and homeless youth crisis services program" for the term "approved runaway program."

10

*See* 2017 N.Y. Laws, ch. 56, pt. M, § 3, eff. Jan. 1, 2018. The amendment did not change the powers and duties of the program.

As originally enacted, the RHYA included three other statutory provisions. Then as now, § 532 merely provided a short title for the RHYA and § 532-c established procedures relating to runaway youth. Section 532-d, which was renumbered § 532-e in 2002, established a "division of youth," which was to oversee the approved runaway programs, maintain a register of those programs, prepare an annual report detailing, *inter alia*, the "service needs" of the runaway and homeless youth, and develop certain regulations. The 2002 amendment to the RHYA substituted "office of children and family services" for "division of youth." *See* 2002 N.Y. Laws, ch. 182.

In 1985, the RHYA was amended to authorize the creation of "transitional independent living support programs," and amended § 532-a to define that term. The powers and duties of those programs were set forth in a new 532-d, and the former § 532-d was renumbered § 532-e. In addition, the amendment expanded the definition of "homeless youth" to include persons up to 21 years of age.

**D. The Instant Motion**

In this motion, both parties focus primarily on N.Y. Exec. Law § 532-b. At the time this action was commenced in 2013, this section required that an approved runaway program:

> (a) provide assistance to any runaway or homeless youth or youth in need of crisis intervention or respite services as defined in this article;
>
> (b) attempt to determine the cause for the youth's runaway or homeless status;
>
> (c) explain to the runaway and homeless youth his legal rights and options of service or other assistance available to the youth;
>
> (d) work towards reuniting such youth with his parent or guardian as soon as practicable ...;
>
> (e) assist in arranging for necessary services for runaway or homeless youth, and where appropriate, their families, including but not limited to food, shelter, clothing, medical care, education and individual and family counseling ...; and
>
> (f) immediately report to the local child protective service where it has reasonable cause to suspect that the runaway or homeless youth has been abused or neglected or when such youth maintains such to be the case.

The term "approved runaway program" was defined to mean:

> any non-residential program approved by the office of children and family services after submission by the county youth bureau, as part of its comprehensive plan, or any residential facility which is operated by an authorized agency as defined in subdivision ten of section three hundred seventy-one of the social services law, and approved by the office of children and family services after submission by the county youth bureau as part of its comprehensive plan, established and operated to provide services to runaway and homeless youth in accordance with the

> regulations of the office of temporary and disability assistance and the office of children and family services.

N.Y. Exec. Law § 532-a(4) (McKinney's 2013, 2018).

The definition of the term "runaway and homeless youth crisis services program" is very similar. That term, which was introduced by the 2017 amendments to the RHYA, means:

> (a) any non-residential program approved by the office of children and family services, after submission by the municipality as part of its comprehensive plan, that provides services to runaway youth and homeless youth in accordance with the regulations of the office of children and family services; or (b) any residential program which is operated by an authorized agency as defined in subdivision ten of section three hundred seventy-one of the social services law, and certified by the office of children and family services to provide short-term residential services to runaway youth and homeless youth in accordance with the applicable regulations of the office of temporary and disability assistance and the office of children and family services.

N.Y. Exec. Law § 532-a(4) (McKinney's 2018).

By its terms, § 532-b originally imposed duties solely on "approved runaway programs" and now imposes duties on "runaway and homeless youth crisis services programs." Those duties are phrased in vague, almost aspirational, terms. For example, the statute does not require programs to provide shelter, much less a

particular type of shelter. Rather, it requires the programs to "provide assistance," including "assist[ance] in arranging" shelter.

The section does not mention, or impose any duties, on the municipalities which help finance the programs. Plaintiffs concede that the City does not operate any "approved runaway programs" or "runaway and homeless youth crisis services programs," noting that "not-for-profit entities ... operate the youth shelters on a day-to-day basis." Plaintiffs' Opposition, p. 5. However, Plaintiffs, noting that the City funds these programs, argue that N.Y. Exec. Law § 420 can be read as imposing "obligations" on the City, which cannot be passed to the "non-profit shelter providers." *Id.*, p. 9.

Section 420(2) does indeed impose obligations on those municipalities which seek State aid to provide services for runaway and homeless youth. Although this subsection has been amended twice since this action was commenced in late 2013, all versions in effect since January 1, 2014, have required a municipality to submit a "runaway and homeless youth plan" "[i]f the municipality is seeking state aid to provide services for runaway and homeless youth." N.Y. Exec. Law § 420(1)(c)(3). That plan must, among other things, "provide for a coordinated range of services for runaway and homeless youth and their families including preventive, temporary shelter, transportation, counseling, and other necessary assistance ...." N.Y. Exec. Law §420(2)(a).

14

The requirement that the municipality create a plan, however, does not obligate the municipality to guarantee a certain level of service. Section 420(2) merely describes the bureaucratic prerequisites for state funding, including the requirement that municipalities present a plan for providing services in order to be eligible for State reimbursement. There is nothing in the statutory language to support Plaintiffs' contention that "once [a municipality] accepts state money to run and fund runaway and homeless youth program, it must provide those benefits to *all* eligible homeless youth." Plaintiffs' Opposition, p. 12 (emphasis in original).

### D. Canons of Statutory Construction

Even if the plain language of § 420 could be read as supporting Plaintiffs' interpretation, the canons of statutory interpretation would militate against that interpretation. First, it is well-established that a "statute should be interpreted in a way that avoids absurd results." *CSX Transp., Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 471 (2d Cir. 2018). The Court agrees with Defendant's contention that it would be absurd to read § 420 as forcing municipalities to make an all-or-nothing choice of either guaranteeing shelter to all runaways and homeless individuals or refusing to fund services for runaways and homeless youth altogether.

Under the legislative scheme at issue, the amount of State aid provided to a municipality does not depend on the municipality's runaway and homeless youth

population or the expected demand for services. Since 2014, § 420(2)(d)(1) has provided that "[m]unicipalities having an approved runaway and homeless youth plan pursuant to this subdivision shall be entitled to reimbursement by the state for sixty percent of the entire amount of the expenditures for programs contained in such plan as approved by the office of children and family services." By predicating State reimbursement on municipal expenditures for runaway and homeless youth programs, this subsection creates incentives for municipalities to invest more in those programs. No such incentive structure would be necessary if the acceptance of any State aid obligated the municipality to satisfy the needs of all runaways and homeless youth. Moreover, Plaintiff's interpretation would create a powerful disincentive for municipalities to pursue State aid by making them bear the risk of unanticipated demand for runaway and homeless youth services.

      Second, Plaintiffs' interpretation would create "internal inconsistencies" in the statutory scheme. Plaintiffs note that the RHYA sets forth a framework for dealing with runaway youth, in which the runaway can progress from a crisis shelter to a transactional independent living program and, eventually, to independent living. Plaintiffs contend that it "would be irrational" to interpret the statute as allowing participating municipalities to disrupt this framework by "shirk[ing] their responsibility to supply adequate shelter to meet that need." Plaintiffs' Opposition, p. 11.

The Court notes that, however, that recent amendments to § 420(2) make it clear that a municipality's "runaway and homeless youth plan" need not provide for crisis shelters and transactional independent living programs. In 2017, § 420(2)(a) was amended to add a new subsection 3, effective January 1, 2018, which provides, *inter alia*, that such a plan "may ... (i) include provisions for transitional independent living support programs and runaway and homeless youth crisis services programs as provided in article nineteen-H ...." This new provision is inconsistent with Plaintiffs' interpretation of the RHYA as mandating a particular framework.

In addition, the Court notes that § 420(2)(b) requires each county to submit, at the request of OCFS:

> (1) A description of the current runaway and homeless population including their age, place of origin, family status, service needs and eventual disposition;
>
> (2) A description of the public and private resources available to serve runaway and homeless youth within the municipality; [and]
>
> (3) A description of new services to be provided and current services to be expanded.

This provision appears to anticipate a mismatch between the service needs of the runaway and homeless youth population and the resources available to serve them, which would necessitate new services and an expansion of current services. There

would be no need to create new services or expand current services if the municipalities were already meeting 100 percent of the need.

This Court is not persuaded by Plaintiffs' attempts to analogize the provisions of the RHYA to statutory schemes such as the IDEA and SSA, which obligate a state that accepts federal funding to extend benefits to all eligible beneficiaries. To be sure, courts may, on occasion, be "able to learn the purpose ... of legislation ... by referring to other similar legislation." Norman J. Singer & J.S. Shambie Singer, Statutes and Statutory Construction, § 53:3 (7th ed. 2012). However, Plaintiffs have not pointed to any similarities between the RHYA and these other statutes that suggest it would be appropriate to look to the IDEA or SSA in order to divine the purpose behind the RHYA.

### E. Legislative History

Since the Court finds that the plain meaning of the statutory scheme at issue does not support Plaintiffs' contention that the RHYA obligates the City to provide youth-specific services to any 18- to 20-year-old homeless individual who seeks them, the Court need not consider Plaintiffs' arguments relating to legislative history. Nonetheless, the Court notes that the legislative history does not support Plaintiffs' suppositions regarding the RHYA's purpose. As noted in an August 3, 1978, letter from the New York State Catholic Conference to the Counsel to the Governor, there was "no state statute relative to the provision of services to

runaway or otherwise homeless youth" at the time the RHYA was introduced. Declaration of Lisa E. Cleary in Support of Plaintiffs' Opposition to Defendant's Motion for Partial Summary Judgment. Ex. 52, p. 27. According to the Bill Memorandum authored by Assemblyman Lasher, the purpose of the legislation which created the RHYA (the "Bill") was to rectify that deficiency by "establish[ing] a framework for the provision of services to runaway and homeless youth," including "procedures for the referral, care and responsibilities of approved runaway and homeless youth programs ...." *Id.*, p. 11. The Bill itself did not create any such programs, however. Rather, as Governor Mario Cuomo stated in a memorandum dated August 8, 1978—about six weeks after the Bill was approved by the State Assembly and the State Senate—the Bill provided for State reimbursement to "encourage counties to develop new and expanded programs ...." *Id.*, p. 22. There was no assurance that the programs would be forthcoming or that the expenditures authorized by the Bill—an amount which the Mayor of Buffalo characterized as "modest," *id.*, p. 26—would be sufficient to meet the need.

  Nothing in the legislative history suggests that the legislation required counties or municipalities which accepted the State aid to meet 100 percent of the demand for shelter from runaways and homeless youths. As stated by the New York State Department of Social Services in a Memorandum accompanying comments on the Bill when it was before the Governor for Executive Action, the

Bill only "authorize[d] the establishment of 'approved runaway programs.'" *Id.*, p. 9. While the legislation imposed certain reporting and oversight requirements on participating municipalities, there is nothing in the legislative history to suggest that those municipalities which elected to fund programs for runaway and homeless youths were required to ensure that the programs created would meet the needs of the runaways and homeless adults in those municipalities.

## CONCLUSION

For the reasons stated above, Defendant's motion for partial summary judgment is granted. Plaintiffs' RHYA claim is dismissed with respect to all plaintiffs who were age 18 or older at the time this action was commenced. The Court expresses no opinion regarding whether the RHYA imposes a duty on the City to provide youth-specific shelter to runaway and homeless youths who are 16 or 17 years of age since that issue is not presented by the instant motion.

SO ORDERED.

/s/(SJ)

Dated: March 30, 2018
Brooklyn, New York

Sterling Johnson, Jr., U.S.D.J.